BOEWE, Appellant and Cross–Appellee,

v.

FORD MOTOR COMPANY, Appellee and Cross–Appellant.

[Cite as *Boewe v. Ford Motor Co.* (1992), 94 Ohio App.3d 270.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 61183.

Decided Nov. 25, 1992.

*Shapiro, Kendis & Assoc.* and *David G. Schmidt,* for appellant and cross-appellee.

*Squire, Sanders & Dempsey* and *Jeffrey J. Wedel,* for appellee and cross-appellant.

*Lee Fisher,* Attorney General, and *Q. Albert Corsi,* Assistant Attorney General, for Industrial Commission and Bureau of Workers' Compensation.

---

HARPER, Judge.

Plaintiff-appellant, Ruth H. Boewe ("the employee"), filed a notice of appeal pursuant to R.C. 4123.519 in the Court of Common Pleas of Cuyahoga County, appealing the disallowance of additional workers' compensation for two conditions distinct from a condition for which she was allowed compensation. The case was tried to a jury on two issues: whether an accident in the work place caused (1) sciatica of the right lower extremity, and (2) injury to the lower back requiring a lumbar laminectomy. The jury returned a verdict in favor of the employee on the first issue but responded that the accident did not cause injury to her lower back which resulted in a lumbar laminectomy. The trial court, on December 14, 1990, issued the following journal entry:

"It being the verdict of the jury that Ruth H. Boewe is entitled to participate in the Worker's Compensation Fund and that she has proved by a preponderance of the evidence that a sciatica of her right lower leg was directly caused by an accident suffered by her on October 18, 1978, while employed by the Ford Motor Company but that she has not proved by a preponderance of the evidence that other conditions giving rise to a laminectomy were directly caused by that

accident, judgment is entered for Ruth H. Boewe on her Complaint against Ford Motor Company, James L. Mayfield, the Administrator of the Bureau of Worker's Compensation, and the Industrial Commission of Ohio so that she shall participate in the Worker's Compensation Fund for sciatica of her right lower leg and that Ford Motor Company shall pay the costs of this proceeding."

Both the employee and defendant-appellee, Ford Motor Company ("the employer"), filed timely notices of appeal from this judgment. A careful review of the record reveals that one of the employer's assignments of error has merit, requiring the reversal of the trial court's judgment in part.

## I

On October 18, 1978, a forklift operated by Richard Ying–Ling accidentally collided with a metal rack, which then caught the employee between that rack and another one. The employee testified that she was "crushed" between the two racks. Ying–Ling testified that the employee was struck in the lower portion of her legs. He disagreed that she was "crushed" between the racks and described the accident as a rack sliding into the employee. The employee reported to the company's dispensary, where she notified a nurse, Joan Brown, that she was struck in the lower legs. The employee was first referred to Dr. Arscott at the employer's Central Medical Department and then to a Kaiser facility. She was subsequently admitted to Fairview General Hospital ("Fairview") and was treated by Casimer Radkowski, M.D.

The employee was admitted to Fairview on November 3, 1978 where she stayed for a period of four weeks. Her treatment included pain medication, pelvic traction, heat treatments and whirlpool baths. Dr. Radkowski treated the employee for six months, after which time he instructed her to return to work. She, however, did not return to work thereafter because she "was so in pain and in so many spasm [sic ] [she] could not go to work." There was no indication that the employee ever complained of a back injury or back pain to the employer's nurse or doctor or to the staff of either Kaiser or Fairview.

Ultimately, in February, 1983, the employee underwent a L–4 laminectomy with complete bilateral foramenotomies at L–4 and a discectomy at L–5. In January 1985, she underwent two separate surgeries which resulted in a spinal fusion from L–3 to L–5.

The employee described two previous incidents involving alleged injuries to her back. The first incident occurred in July 1978 after she told her husband of her plans to divorce him. The husband apparently struck her all over with a beer bottle. She went to Kaiser, where she complained of overall achiness and back pain which persisted for a few days. The second incident occurred in September

1978 when the employee slipped on an oil spot at work and felt "something in [her] back." She went to Kaiser, where she complained of "discomfort and back pain * * * and in [her] legs." She learned at this time of the arthritic condition in her back. She missed two days of work and was in pain for two weeks.

At the time of the October 18, 1978 accident, Robert Finnessy served as the supervisor of the employer's workers' compensation program. Finnessy's position required that he first investigate injuries to make sure there is a compensable event. If it is determined there is a compensable event, he then ensures the payment of medical bills.

Finnessy testified that the employee's initial application for workers' compensation benefits contained the following description of her injuries: "[m]arked contusion of lower extremities and sciatica of right lower extremity." Once this application was complete, Finnessy testified, he then verified there was an incident with the employee's foreman. Medical evidence was next accumulated to support the allowance or disallowance of the claim. Finnessy testified the information supplied on the application with regard to the description of the employee's injury was provided by Dr. Radkowski. Finnessy thus initially signed the application as a valid claim.

However, when Finnessy received the employee's medical records, he was alarmed by the final diagnosis. Dr. Radkowski reported therein that the employee suffered from marked contusions of the lower extremities and sciatica of the right lower extremities, *etiology undetermined.* Since Finnessy understood this final diagnosis to mean that Dr. Radkowski could not determine the cause of the sciatica, Finnessy requested a hearing on the claim. The Industrial Commission of Ohio ("the commission") allowed a workers' compensation claim for only "marked contusion of the lower extremities."

The employee thereafter filed an administrative motion in which she requested that the commission formally allow this claim for two other conditions: (1) sciatica of the right lower extremity and (2) an injury to the lower back which required a lumbar laminectomy. The district hearing officer who heard this motion on September 11, 1985 allowed the claim for the condition " '[s]ciatica of the right lower extremity' resulting in a 'lumbar laminectomy.' "

The employer appealed this decision to the Cleveland Regional Board of Review ("the board"). On January 8, 1986, the board vacated the hearing officer's order, which was found to not be supported by the evidence. The staff hearing officers of the commission affirmed the board's order on May 21, 1986. It was from this result that the employee filed the R.C. 4123.519 appeal in the trial court.

At trial, the employee presented the deposition testimony of Ralph A. Reilly, M.D. Dr. Reilly opened his testimony with an explanation of the medical term "sciatica." He stated that sciatica, a descriptive rather than a diagnostic term, is pain in the distribution of the sciatic nerve. The nerve extends down the back part of the leg and distributes nerves to various areas of the lower leg. The term "sciatica" is loosely used to describe pain down the leg, which may or may not be directly involved with the sciatic nerve. He further testified that sciatica is not necessarily related to the spinal column, the vertebrae or the discs. Dr. Reilly then proceeded to testify about his contact with the employee.

The employee visited with Dr. Reilly on June 20, 1983. After receiving the patient's history, the doctor performed a physical examination. The following dialogue between counsel and Dr. Reilly ensued:

"Q. Based upon this examination, Doctor, based upon the history, the complaints, the physical examination and the x-ray examination, did you have an occasion to form, with reasonable medical probability, a diagnosis of Ruth's condition?

"A. Yes, I did.

"Q. What was your diagnosis?

" * * *

"A. The diagnosis was of degenerative spondylosis and spondylolisthesis at the fourth lumbar interspace.

"Q. Could you share with us what those two terms mean, Doctor?

" * * *

"A. Degenerative spondylosis means a degenerative condition of the intervertebral disc. Spondylolisthesis means that the disc has lost its supportive function and allowed a slippage of one vertebral body on another.

"Q. Did you have an occasion to form an opinion, based upon reasonable medical probability, as to the relationship between the spondylolisthesis and the laminectomy that Ruth underwent in—earlier that year, I guess?

" * * *

"A. At the time of the examination I felt that the spondylolisthesis was largely secondary to the extensive laminectomy that had been performed.

"Q. Did you have an occasion at that time to form an opinion, based upon reasonable medical probability, as to whether or not her condition, as of the time of that examination, based upon the information available to you at that time, was the direct or proximate result of the October 18, 1978 industrial injury?

" * * *

"A. At that time I felt it was a result of that injury, yes.

" * * *

"Q. I hand to you what has been identified or is marked as an x-ray at Kaiser Hospital of September 16, 1978 of Ruth Boewe's low back. Could you share with us the result of that x-ray?

"A. This was the dorsal and lumbar spine, and reported was that 'Routine view shows spondylolysis of L5 on the left.'

"Q. Again, would you explain to us what the spondylolysis of the L5 on the left refers to, Doctor?

"A. That's a new term. Spondylolysis means that there's a boney defect through what's called the parts interarticularis, which is the—connects the upper and lower facettes of the posterior facette joints."

The employee's counsel then sketched a hypothesis for the doctor and ended with the following question:

"Q. I would ask you, based upon this information, whether you have an opinion, with reasonable medical probability, as to whether or not the industrial injury of October 18, 1976 [sic] directly or proximately caused or aggravated a pre-existing condition resulting in a physical disability which eventually resulted in the laminectomy?"

The doctor responded:

"A. My opinion is that given all that history, the probability is that she had a degenerative condition in the L4 disc; this condition was aggravated and accelerated by the injury described; and that there were continuing degenerative changes over the succeeding few years which eventually led to the treatment described."

The employer offered the deposition testimony of Donavin A. Baumgartner, Jr., M.D. to counter that of the employee's doctor. The doctor defined for the jury the lumbar laminectomy procedure as an operation to remove some bone of the spine to prepare for some form of surgery in that area. He then defined degenerative disc disease as a progressive, chronic condition of the spine which is primarily a premature aging or wearing out of the disc space of the disc fitting between the vertebrae. Finally, he began his definition of a herniated disc by stating that a disc is made up of two parts, outer and inner portions. As the disc weakens, the center portion protrudes, hence the herniated disc. He opined that degenerative disc disease is almost always the cause of a herniated disc.

Dr. Baumgartner examined the employee in September 1983. He testified to the results of his examination as follows:

"Q. Doctor, * * * given the history provided by Ms. Boewe, and given your physical examination, are you able to express an opinion within a reasonable degree of medical certainty whether the incident described by you, or to you by Ms. Boewe of October 18th, 1978 involving the tow motor was the direct and proximate cause of sciatica of the right lower extremity resulting in a lumbar laminectomy?

" * * * *

"A. I think the reason for her sciatica and the laminectomy were clearly the ruptured disc that was shown in 1983 at the time of surgery. It was not caused by anything that happened in '78, since it wasn't even present in 1981. * * *

" * * * *

"Q. Doctor, are you able to express similarly an opinion within a reasonable degree of medical certainty as to whether a degenerative condition existed in Ms. Boewe's lumbar spine?

" * * * *

"A. She has evidence of two degenerative processes in her lumbar spine that are of many years duration. One is osteoarthritis, and the second is degenerative disc disease.

"Q. Doctor, can you express an opinion within a reasonable degree of medical certainty, again, in consideration of the records which you have reviewed, the history you've taken, and your physical examination, as to whether the incident described by Ms. Boewe on October 18th, 1978 caused either of the two degenerative conditions you found to exist in her spine?

" * * * *

"A. * * * trauma does not cause, injury does not cause either one of these conditions. They were present well prior to that date first of all, and second of all, neither of these is caused by injury of any kind.

"Q. Do you find that the injury she described, or the incident she described on October 18th, 1978 aggravated either of these two degenerative conditions?

"A. No. These are not the type of conditions that are aggravated by that form of injury. * * * "

A review of both Dr. Reilly's and Dr. Baumgartner's testimony reveals that they agree that the employee suffered from a degenerative condition of the lumbar spine which preceded the October 18, 1978 incident. They further agree that the employee underwent a lumbar laminectomy to correct the degenerative condition. Dr. Reilly opined that the incident aggravated and accelerated the condition and led to the lumbar laminectomy. Dr. Baumgartner, in contrast,

opined that the incident did not aggravate or accelerate the degenerative condition; according to the doctor, a ruptured disc alone caused the lumbar laminectomy.

## II

The employee's first assignment of error provides:

"The trial court committed prejudical [*sic*] error determining that plaintiff-appellant has not proved by a preponderance of the evidence that other conditions giving rise to a laminectomny [*sic*] were directly caused by her accident where such a determination is inconsistent with the general verdict and is not supported by the answers to the jury interrogatories."

The jury returned a general verdict which stated that the employee was entitled to participate in the workers' compensation fund. The following two interrogatories were submitted to the jury:

"1. Was sciatica of the right lower leg directly caused by the accident of October 18, 1978?"

"2. Was another condition giving cause to perform a laminectomy directly caused by the accident of October 18, 1978?"

The jury responded in the affirmative to the first interrogatory but in the negative to the second.

The employee argues that the second interrogatory was a compound question which could not be answered simply with a "no" as was done here. She hypothesizes that the jury's answer could be interpreted in three ways. First, the jury could have meant that only the sciatica necessitated the lumbar laminectomy and not "another condition." Second, the jury could have meant that the injury aggravated an already existing degenerative condition which resulted in the surgery but that it was not directly caused by the accident. The employee suggests that this interpretation is consistent with Dr. Reilly's testimony. Finally, the jury could have believed Dr. Baumgartner's theory that a ruptured disc caused the laminectomy, therefore "another condition" caused the surgery but it was not directly caused by the accident. The employee argues that the trial court should have entered a verdict in favor of allowing her to participate in the workers' compensation fund for both the sciatica and the lumbar laminectomy based on the allegation that the answers to the interrogatories were not inconsistent with the general verdict.

Initially, it is noted that the employee failed to object to the form of the interrogatories at trial even though she was given an opportunity to do so. A reviewing court will not consider any error which a party failed to bring to the

trial court's attention at a time when that error could have been avoided or corrected by the court. *LeFort v. Century–21 Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 123, 512 N.E.2d 640, 642–643; *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 70 O.O.2d 123, 322 N.E.2d 629. If the employee was dissatisfied with the interrogatories, her failure to object to the form of them prior to their presentation to the jury waives this error on appeal.

Assuming *arguendo* there was an objection upon the record, the employee's argument has no merit. Civ.R. 49(B) provides in relevant part:

"The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law."

The form and content of submitted interrogatories is a matter left to the sound discretion of the trial court. *Ragone v. Vitali & Beltrami, Jr., Inc.* (1975), 42 Ohio St.2d 161, 71 O.O.2d 164, 327 N.E.2d 645, paragraph one of the syllabus. However, an interrogatory "must be directed to determinative issues, hence it is incumbent that the interrogatory be so drawn as to test the jury's thinking in resolving an ultimate issue so as not to conflict with its verdict." *Riley v. Cincinnati* (1976), 46 Ohio St.2d 287, 298, 75 O.O.2d 331, 337–338, 348 N.E.2d 135, 142. Determinative issues are those "issue[s] the deciding of which by the jury may in and of [themselves] dispose of the entire case." Civ.R. 49(B), Staff Note. Therefore, a properly posed interrogatory is one which necessitates a finding of a particular question of fact and is of a determinative nature rather than invites responses of a mere probative or evidentiary quality. *Ragone, supra*, 42 Ohio St.2d at 171, 71 O.O.2d at 169–170, 327 N.E.2d at 652.

The origin of the interrogatories is found in the court's charge to the jury:

" * * * Ruth Boewe is asking you to determine that she is entitled to participate in the Workers' Compensation fund because of sciatica of the right leg and because of certain injuries—bodily conditions I will call them—which were intended to be corrected by a laminectomy. She says that both of these situations, the sciatica and the physical injuries or conditions which gave rise to the laminectomy, that both of these resulted from that accident that occurred to her on October 18, 1978 * * *.

" * * * *

"The questions that you must decide then are whether she has proved by a preponderance of the evidence that the sciatica which she claims she suffered was directly caused by the October 18 accident, and whether that accident directly caused other conditions which gave rise to a laminectomy."

It is not disputed that the jury was required to determine two issues, whether the accident caused the sciatica and whether the accident caused certain back conditions which resulted in the lumbar laminectomy. The trial court chose to refer to the back conditions as just that rather than refer to medical terminology, *i.e.,* spondylosis, spondylolisthesis, and spondylolysis, when even counsel had a difficult time with the terminology. The two issues remained distinct and the interrogatories expressed this distinction. The jury decided that the employee was entitled to participate in the fund due to the sciatica which was caused by the accident and not because of the other conditions which required the laminectomy. We thus find no error in the interrogatories as they were so drawn to test the jury's thinking in resolving an ultimate issue and were not in conflict with the general verdict.

Appellant and cross-appellee's assignment of error is overruled.

### III

The employer's first assignment of error provides:

"A. The Trial Court Erred In Failing to Grant Defendant–Appellee Ford Motor Company's Motion for Directed Verdict.

"1. The Trial Court Erred by Failing to Grant Ford's Directed Verdict Motion With Respect to Sciatica Because Plaintiff Produced No Evidence That She Suffered Sciatica as a Result of the October 1978 Accident and No Expert Testimony That She *Even* Suffered From Sciatica." (Emphasis *sic.*)

The employer herein submits that the employee "did not present any expert testimony whatsoever that she even suffered from sciatica. * * * Dr. Reilly never gave an opinion that plaintiff suffered from sciatica, let alone that sciatica was causally connected to the October 1978 accident. The only opinion Dr. Reilly gave concerning sciatica was that many physicians make inaccurate diagnoses of sciatica." Therefore, the employer argues that the trial court erred in not granting a directed verdict in favor of it on the sciatica issue since there was neither evidence that the employee suffered from sciatica nor evidence of a causal connection between the accident and the sciatica. This argument has merit.

A trial court, in ruling on a Civ.R. 50 motion for directed verdict, must construe the evidence in favor of the party against whom the motion is directed and determine whether reasonable minds could come to but one conclusion. "The 'reasonable minds' test * * * calls upon the court only to determine whether

there exists any evidence of substantial probative value in support of that party's claim." *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 69, 23 O.O.3d 115, 116–117, 430 N.E.2d 935, 938. The court is merely called upon to determine the legal sufficiency of the evidence and is not asked to weigh the evidence. *Id.* at 68, 23 O.O.3d at 116, 430 N.E.2d at 937. See, also, *Helmick v. Republic–Franklin Ins. Co.* (1988), 39 Ohio St.3d 71, 74–75, 529 N.E.2d 464, 467–468; *Eldridge v. Firestone Tire & Rubber Co.* (1985), 24 Ohio App.3d 94, 24 OBR 164, 493 N.E.2d 293. A directed verdict is thus dictated "when there is no evidence tending to prove an essential element of the plaintiff's cause of action." *Job v. Cleveland Dance Ctr.* (1989), 62 Ohio App.3d 678, 686, 577 N.E.2d 396, 401; see, also, *Rayburn v. J.C. Penney Outlet Store* (1982), 3 Ohio App.3d 463, 3 OBR 544, 445 N.E.2d 1167.

 In order to receive workers' compensation benefits for a disability claimed to have resulted from an accidental injury, a claimant must prove two elements by a preponderance of the evidence. First, it must be demonstrated that the injury arose out of and in the course of employment. Second, there must exist a direct or proximate causal relationship between the injury sustained and the subsequent disability. *Fox v. Indus. Comm.* (1955), 162 Ohio St. 569, 576, 55 O.O. 472, 475, 125 N.E.2d 1, 5–6; *Serrano v. Gould* (Feb. 14, 1985), Cuyahoga App. No. 48602, unreported, 1985 WL 6610. Furthermore, medical evidence is necessary to establish causation where the subsequent disability involves complex medical problems outside the knowledge of laymen or jurors. *Fox, supra,* 162 Ohio St. at 577, 557, 55 O.O. at 475–476, 125 N.E.2d at 6.

 A review of Dr. Reilly's testimony reveals that the employer is correct in asserting that the doctor offered no testimony that the employee even suffered from sciatica, let alone that the sciatica was directly or proximately caused by the October 18, 1978 accident. The doctor's expert opinion only concerned the employee's lower back conditions which were either aggravated or caused by the October 18, 1978 accident and then resulted in the lumbar laminectomy. The doctor never mentioned "sciatica" beyond a description of the term. We, therefore, find that the trial court erred in not directing a verdict in favor of the employer on this issue as the employee failed to meet her burden by the preponderance of the evidence.

Appellee and cross-appellant's first assignment of error is accordingly sustained.

## IV

The employer, in its second assignment of error, complains that:

"The Jury Verdict Allowing Participation in the Workers' Compensation Fund for Sciatica is Against the Manifest Weight of the Evidence and Unsupported by the Record."

The disposition of the employer's first assignment of error renders this second assigned error moot. This court, therefore, is not required to review it. App.R. 12(A).

The judgment of the trial court is affirmed in part and reversed in part. Final judgment is, therefore, rendered in favor of defendant-appellee and cross-appellant, Ford Motor Co.

*Judgment accordingly.*

NAHRA, P.J., and KRUPANSKY, J., concur.