MARTIN, Admr., Appellant and Cross–Appellee,

v.

ST. VINCENT MEDICAL CENTER et al., Appellees and Cross–Appellants.

[Cite as *Martin v. St. Vincent Med. Ctr.* (2001), 142 Ohio App.3d 347.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–00–1141.

Decided April 20, 2001.

348

*W. Patrick Murray* and *Steven C. Bechtel,* for appellant.

*Thomas P. Mannion* and *Donald J. Moracz,* for appellee Richard J. Morgan, M.D.

*Ray A. Farris* and *Daniel T. Ellis,* for appellee Surgicor, Inc.

*Jean M. O'Brien* and *James R. Knepp II,* for appellee St. Vincent Medical Center.

HANDWORK, Judge.

This is an appeal from a judgment of the Lucas County Court of Common Pleas which, following a jury trial, entered judgment for appellees, St. Vincent Medical Center, Richard J. Morgan, M.D., John Dooner, M.D. and Associated Anesthesiologists of Toledo, Inc., and Surgicor, Inc., in this medical malpractice action. For the reasons stated herein, this court affirms the judgment of the trial court.

Appellant, Donald Martin, administrator of the estate of his father, Richard H. Martin ("Martin"), sets forth the following three assignments of error:

"Assignment of Error No. 1: The trial court erred in failing to instruct the jury and directing a verdict against appellant on theories of bailment and/or fiduciary duty where the burden of proof shifts to the defendant medical care providers to prove they did not perforate the decedent's trachea and explain how the injury occurred.

"Assignment of Error No. 2: The trial court erred by nullifying/negating the *res ipsa loquitur* instruction by giving Interrogatory No. 1 requiring the jury to specifically ascertain how the decedent's trachea was perforated.

"Assignment of Error No. 3: The trial court erred by nullifying/negating the *res ipsa loquitur* instruction by instructing the jury if it 'was unable to determine how the injuries and death happened * * * then [it] cannot determine whether there was negligence then your verdict must be for all defendants.' "

The following facts are relevant to this appeal. On September 23, 1996, appellant filed a complaint[1] alleging that appellees were negligent in the care provided Martin during quadruple coronary artery bypass graft ("CABG") surgery, which was performed on June 8, 1993, at appellee St. Vincent Medical Center ("St. V's"). The complaint also alleged that Martin's trachea was negligently punctured during the course of his intubation and that one or more appellees were negligent in failing to timely discover and treat the puncture wound, that Martin developed mediastinitis, which led to his untimely death or, alternatively, that appellees' negligence resulted in a loss of chance of his survival. The complaint also alleged that the negligent puncture of Martin's trachea was not an event which ordinarily occurred during this type of surgery and that the probable instrumentalities which caused the puncture were in the exclusive management and control of appellees. The complaint further alleged bailment and breach of fiduciary duty as theories of recovery.

Discovery was conducted. Defense motions for summary judgment were denied and the case proceeded to jury trial on March 13, 2000.

At trial, appellant called appellee Richard J. Morgan, M.D. ("Morgan"), a cardiothoracic surgeon who operated on the decedent, to testify as on cross-examination. Morgan testified that he finished his fellowship training in cardiothoracic surgery in 1982, that he practiced cardiothoracic surgery in other institutions before he joined the staff at St. V's in 1992, that he practiced cardiothoracic surgery at St. V's for approximately a year and three months, and that he currently lived and worked in Florida. Morgan testified that he first saw Martin on May 11, 1993, to assess him to determine whether or not Martin was a candidate for CABG surgery and that he operated on Martin on June 8, 1993. Morgan testified that Martin was thought to be a good candidate for CABG surgery because his life expectancy without this surgery was low. Morgan described the anatomy involved in CABG surgery, the typical CABG surgery procedure (including cardiopulmonary bypass, which uses a heart-lung machine), the specific difficulties encountered during Martin's surgery because of acidotic

---

1. The complaint also states that a complaint filed on July 13, 1994, was dismissed without prejudice pursuant to stipulation of the parties on September 16, 1996.

plaquing or hardening of his arteries, the procedure to remove the patient from cardiopulmonary bypass called coming off bypass at the completion of CABG surgery, and the closing or suturing of the various layers of anatomy.

Morgan testified that at no time during Martin's surgery did Morgan use any equipment above the level of the clavicle. Morgan also testified that at no time during Martin's surgery did Morgan get any closer than three or four inches from Martin's trachea. Morgan testified about the function of the various parts of and the placement of an endotracheal tube; he also described the anatomy of the trachea and its cartilaginous rings and the bronchial tubes. Morgan testified that he has never punctured the trachea in all the cardiac surgeries that he has performed, that he has never heard of any of his cardiac surgery colleagues puncturing the trachea, and that in all the medical literature he has never read of any cardiac surgeon puncturing the trachea during open-heart surgery.

Morgan testified that from a technical point of view Martin's cardiac surgery was successful. When Martin was taken to the cardiovascular intensive care unit ("CVICU"), the endotracheal tube was replaced because there was a leak causing air to escape although the source of the leak was not known at that time. Ultimately, the leak was discovered to be in the third tracheal ring. Morgan testified that he himself never intubated Martin.

Morgan also testified that Martin was recovering well from surgery on June 9. However, on June 10, there was air leaking from the plastic chest tubes placed routinely to drain fluid and air from the chest cavity. Additionally, Martin was developing subcutaneous emphysema, air under his skin. Martin was taken back to the operating room where his incision was re-opened to decompress the air and allow the doctors to look directly at both lungs. The lungs were normal but Morgan observed what he described as a thin layer of slime which he suspected had something to do with an infection. Therefore, Morgan took cultures of the substance; he also treated the operative area as if it was an infection and irrigated the mediastinum, the area of the chest between the lungs, with a Betadine solution. The cultures grew a bacteria called Pseudomonas, a necrotizing organism which kills the surrounding tissues. Morgan opined that the bacteria got into Martin's chest through the hole in his trachea.

Morgan also testified that on June 14, Dr. Reddy ("Reddy"), one of the anesthesiologists caring for Martin, observed that the leak around his endotracheal tube was dependent on position: in one position there would be no leak and in another there would be a three hundred cubic centimeter loss of air. Reddy concluded that there was a hole in Martin's trachea and, therefore, Morgan did a flexible bronchoscopy and located a two millimeter hole or injury to the trachea on the anterior wall with a surrounding area of necrotic tissue. Morgan testified that on June 18, he performed a tracheostomy on Martin and during this

procedure, Morgan observed that, rather than healing, the hole had become bigger, which Morgan attributed to the bacteria.

On June 19, because Martin had begun bleeding from the chest tubes, Morgan reexplored Martin's sternum. Morgan testified that he thought at the time that the infection was necrosing the tissue at a suture site on the vein graft. Morgan testified that it is unusual to find a hole in a vein graft so long after the operation unless there is infection. The graft was repaired. During this procedure, Morgan also testified that necrotic tissue destroyed by the bacteria was debrided or cut away. On June 23, Martin again began bleeding and the repair of the artery done on June 19 was discovered to have broken down and a bigger hole was bleeding because of infection. Morgan determined that this graft should be removed as it was not an essential graft, that Martin would survive without it, and that Morgan was not sure it would hold the sutures. Martin underwent another operation on June 24, a sternectomy with debridement of wound as Martin continued to necrose tissue. On June 30, Martin again bled and Morgan discovered that the infection had eroded the other side of the vein graft that had been previously ligated; Morgan attached a clamp to which the vein graft was sewn.

On July 14, Martin's respiratory status began to deteriorate, which the infectious disease physicians caring for him thought was due to a fungus. On July 15, Martin arrested, his heart stopped, and the physicians resuscitated him. On July 16, the physicians told Martin's family that he would not be able to survive and that everything possible had been done for him. Martin died on July 16, 1993.

Morgan testified that unless there was some anatomic anomaly, there were only two possible causes of Martin's injury: (1) during intubation with the endotracheal tube, or (2) during the insertion of the needle into the right internal jugular vein for an internal jugular line. Morgan testified that damage due to endotracheal intubation is a well-known phenomenon; he also testified that there are reports in the medical literature of hitting the trachea during a right jugular stick. Morgan also testified that surgical complications such as this can occur when nobody has done anything negligent, that Martin's specific injury could have occurred without anybody doing anything below the standard of care, and even if Martin's specific injury occurred from the jugular line it was not below the standard of care.

The certified registered nurse anesthetist who administered part of Martin's anesthesia, Rebecca Roche, testified that she began the eighteen-month nurse anesthetist program at St. V's in March 1976, graduated in September 1977, and began work with appellee Associated Anesthesiologists of Toledo, Inc. ("anesthesia group") at St. V's. Roche testified that she was the co-manager of Martin's

care with an anesthesiologist, that it was the policy at St. V's that a team of both a nurse anesthetist and an anesthesiologist was assigned to each case, that the anesthesiologist would at times be working in two operating rooms with a nurse anesthetist in each; and that both Dr. John Dooner, an anesthesiologist, and she were present at the introduction of anesthesia for Martin.

Roche described intubation. She testified that she did not use a stylet to intubate Martin, that she never uses a stylet to intubate a patient on the first attempt and only uses a stylet for a patient with difficult anatomy, that Martin's intubation was straightforward with no complications, and that Martin had no apparent anatomical irregularity or anomaly. She denied causing a hole in Martin's trachea.

Roche also described the procedure for a right jugular vein stick to put in an internal jugular catheter for heart monitoring and to give intravenous fluids. She testified that according to her charting she hit the jugular vein on the first attempt, that she would have charted if there had been multiple attempts or if she hit something other than the jugular vein, that she uses a twenty-five-gauge finder needle when she uses a medial approach to the jugular vein, that the twenty-five-gauge finder needle is not long enough to hit the trachea, that she is not aware of ever hitting the trachea with a needle and that she would be aware of hitting the trachea with a needle because of the sensation of hitting something harder, and that she obtained venous blood on her first attempt to stick Martin's jugular vein.

On cross-examination by counsel for Dooner, Roche testified that she also reintubated Martin without a stylet with Dooner's assistance in the CVICU immediately following surgery. On cross-examination by counsel for Morgan, Roche testified that during Martin's surgery she did not see Morgan or any surgical personnel do anything that could have caused the hole in Martin's trachea. She further testified that she was not aware of any instances in the medical literature where an unstyletted endotracheal tube caused an injury to the trachea in a controlled, operative setting and that she was not aware of any instances where the right internal jugular line caused injury to the trachea in a controlled, operative setting. In both instances, however, she agreed that if there was medical literature she would not dispute it.

The deposition of Dr. James W. Pate, a semiretired Memphis, Tennessee cardiothoracic surgeon, an expert for appellant, was read to the jury. Pate testified that the last CABG that he performed was three or four years before his deposition. He also testified that he reviewed Martin's medical records and the deposition of Dr. Thomas O'Grady, a general and cardiothoracic surgeon who appeared as an expert for Dooner and the anesthesia group. After reviewing Martin's surgical and hospital course, Pate testified that Martin's surgery was

successful, that Martin's demise was due to the perforation of his trachea, that in all the thousands of CABG procedures he has performed that he has never perforated a trachea, that he has never heard of a cardiac surgeon perforating a trachea during a CABG, that there was no evidence in the record to suggest that Morgan perforated Martin's trachea during the CABG, and that if a cardiac surgeon perforated a patient's trachea during a CABG, it would be below the standard of care. Pate also opined that the only reasonable explanation for the perforation was secondary to one of the intubations. Pate also testified that the damage to Martin's trachea was not caused by an eighteen-gauge needle used during the jugular stick.

On cross-examination by counsel for Dooner and the anesthesia group, Pate agreed that there was no mention that a stylet was ever used. On cross-examination by counsel for Morgan, Pate opined that Morgan did not cause the perforation or otherwise injure Martin and that Morgan's care was within the standard of care. On cross-examination by counsel for St. V's, Pate admitted that although he saw no evidence of a congenital anomaly or a weakened condition of Martin's trachea, he could not rule out their presence based solely upon his review of the medical records. On cross-examination by counsel for appellee Surgicor, Inc. ("Surgicor"), Pate admitted that an autopsy would have assisted in determining if Martin had arthritic changes in the neck. On redirect examination, Pate testified that there was no indication in the medical records of any severe arthritis or any other anomaly of any sort.

Dr. John Hoyt, a Pittsburgh anesthesiologist and critical care physician who is clinically active fifty percent as an anesthesiologist and fifty percent as an administrator, testified as an expert for appellant. Hoyt testified that he reviewed Martin's medical records and the depositions of Morgan, Dooner, and Roche. Hoyt opined that it was most likely that the puncture in Martin's trachea was caused by a stylet in the endotracheal tube either in the initial intubation or at the time the endotracheal tube was changed in the CVICU, and that putting such a hole in Martin's trachea with a stylet is outside the standard of care. Hoyt testified that he has heard of a stylet injuring the trachea during intubations in an uncontrolled environment when done by a paramedic, that he has never punctured a trachea with a stylet in his practice, and that he has never seen an injury like this in his practice.

Hoyt also testified that he has inserted an eighteen-gauge needle into the trachea for certain anesthesia reasons but he has never injured the trachea doing this. He testified that insertion of an eighteen-gauge needle into the trachea would not led to an injury to the trachea. In regard to the insertion of a central venous catheter into the right jugular vein, Hoyt testified that he uses the same procedure used by Roche in this case. He testified that one can do this needle

insertion without a finder needle as long as the anatomic pattern is followed. Hoyt testified that using the same procedure used by Roche in this case, it would not be possible to enter the trachea. He testified that even if the needle insertion was done incorrectly, the insertion point would be on the side of the trachea, not on the anterior of the trachea at the third tracheal ring where the injury was located in this case. Hoyt testified that there was no evidence in Martin's medical records of an anatomic abnormality or any arthritic changes. Hoyt also testified that a hole in a trachea does not occur as a routine part of a CABG procedure and that the hole led to the infection, sepsis, and ultimately death.

On cross-examination by counsel for Dooner and the anesthesia group, Hoyt admitted that during a CABG procedure when the surgeon does a mediastinotomy with a saw, the saw would be within an inch or two from the third tracheal ring. Hoyt also admitted that there was no evidence in Martin's medical records that a stylet was used in the endotracheal tube either in the initial intubation or at the time the endotracheal tube was changed in the CVICU, admitted that an unstyletted endotracheal tube could not have caused Martin's injury, and admitted that if a stylet was not used in either of the intubations, then his conclusion that Martin's injury was caused during intubation by the anesthesia team was unfounded. Hoyt agreed that complications can occur without malpractice. Hoyt also admitted that during his deposition he agreed it was possible that, given the fact that no autopsy was performed, some kind of weakening in Martin's tracheal wall made Martin's trachea more susceptible to this kind of injury and that if that was true, then Martin's trachea could have been injured without someone being negligent. Hoyt also agreed that Morgan measured the distance from the vocal cords to the injury to be four centimeters, that this distance would put the hole right in the area where the upper mediastinum is entered (the area of the sternal notch), that this notch is where the trachea goes into the chest, and that the very top two inches of the trachea extends out of the chest.

Counsel for Dooner and the anesthesia group also questioned Hoyt about a peer-reviewed article entitled "An Unusual Cause of Compromise of the Airway During Cardiac Surgery" from the Journal of Cardiothoracic Anesthesia, an article with which Hoyt admitted he was not familiar. The article reported a case in which an endotracheal tube cuff malfunction and loss of volume from the airway occurred incidental to a burn and injury to the anterior cartilage of the trachea from the electrocautery used during a standard mediastinotomy incision in a patient undergoing elective cardiac surgery. Hoyt agreed that the facts of the case *sub judice* were the same as those in the case reported in the article. The article also reported that the strap muscles were dissected to expose the trachea and it was evident that a burn from the electrocautery had injured the

anterior cartilage of the trachea. Hoyt agreed that this article required him to put a burn injury from cautery in the range of being probable as a cause of Martin's injury and agreed that the probability that Martin's injury was caused by cautery is greater than the probability that Martin's injury was caused by intubation. Hoyt also agreed that if the facts as stated in the article occurred, it would not be a deviation from the standard of care by the anesthesia team.

On cross-examination by counsel for Morgan, Hoyt agreed that during his deposition his testimony was that Morgan did not do anything to cause the injury to Martin's trachea. Hoyt also agreed that Morgan testified that he visualized the hole in Martin's trachea behind the thyroid gland. In regard to the article cited above, Hoyt agreed that there were some factual differences between the article and the case *sub judice*. Hoyt also agreed that during his deposition his testimony was that if a styletted endotracheal tube did not cause Martin's injury, then the cause of the perforation was a mystery to him. Counsel for Morgan also questioned Hoyt about an article entitled "Membranous Tracheal Rupture After Endotracheal Intubation" from the Annals of Thoracic Surgery. The article listed mechanical factors contributing to tracheal rupture with endotracheal tubes, such as multiple vigorous attempts at intubation, inexperienced anesthesiologists, vigorous coughing, abrupt head and neck movement and inappropriate use of a stylet. On cross-examination by counsel for St. V's, Hoyt stated that the size of an air leak would depend upon how much of a hole there was in the cuff of the endotracheal tube because a seal is no longer achieved against the wall of the trachea.

On redirect examination, Hoyt testified that he had seen nothing that would change his opinion as to the cause of Martin's injury. Hoyt also testified that Martin's injury was a round puncture wound and not a burn in the sense of blackened tissue.

On recross-examination by counsel for Dooner and the anesthesia group, in regard to the article entitled "Membranous Tracheal Rupture After Endotracheal Intubation" from the Annals of Thoracic Surgery, Hoyt stated that the membranous trachea normally refers to the posterior muscular part of the trachea and that was not what was ruptured in the case *sub judice*. Hoyt agreed that none of the injuries reported in that article were at all similar to the injury in this case in that the tears were longitudinal, the tears were always linear lacerations of the membranous wall near the cartilage on the right side, and the tears were longer than the injury here. Four tears ranged from two to six centimeters long. Hoyt admitted that there was no evidence in the chart and nothing in the testimony of the witnesses that a stylet was used on Martin on June 8, 1993. Hoyt also admitted that he could not reach his opinion unless he assumed that a stylet was used.

On recross-examination by counsel for Morgan, Hoyt testified that Martin's wound was a puncture and not a burn. Hoyt also agreed that, contained in the article entitled "Membranous Tracheal Rupture After Endotracheal Intubation," is the statement that some reports indicate that tracheal lacerations may occur with any type of atraumatically (without resistance) placed endotracheal tube. On recross-examination by counsel for St. V's, Hoyt testified that after two or three days of necrotizing infection one could not tell whether Martin's injury was caused by a penetrating wound or puncture or a cautery cut.

Appellant called Dooner to testify as on cross-examination. Dooner testified that the hole in Martin's trachea was not caused by any actions related to the anesthesia providers, that he was not sure the cause would ever be ascertained, that the intubation did not cause the hole, that either the mediastinotomy or use of the electrocautery could have injured Martin's trachea, that the probability of having tracheal damage from two routine intubations without the use of a stylet is as close to zero as you can get in the real world, that it would take an enormous amount of force to do damage to the anterior part of the trachea, and that in an elective surgery in a normal patient without any complications regarding the airway, perforation of the trachea would be an unexpected event.

Dooner also testified that when Roche and he changed Martin's endotracheal tube in the CVICU following surgery on June 8, he did not see any damage to or anything wrong with the cuff of the endotracheal tube. Dooner also testified that Morgan would have been within an inch or so of the trachea when he was at the top of the sternum. When asked who put the hole in Martin's trachea, Dooner opined that the patient could have had an overwhelming infection that eventually invaded part of the trachea, noting that Martin had a prior lung infection, that there could have been a very rare surgical misadventure such as the trachea pressed with a retractor or a spark from the electrocautery, or that Martin had an unknown tracheal problem.

Donald Martin ("Donald"), the administrator of his father's estate, testified that his father retired at age sixty-two, had a heart attack in 1992 after he retired, and was sixty-four when he died at St. V's on July 16, 1993. Donald testified that his father did not have any arthritis in his neck. Jeanette Martin, Martin's widow, as well as Martin's two daughters and three other sons, all testified as to Martin's life, his hospital course, and the impact of his death on their lives.

Dr. Jeffery Vender, a Northwestern University anesthesiologist from Chicago who is clinically active seventy percent as an anesthesiologist and critical care physician and thirty percent as an educator and administrator, testified as an expert for Dooner and the anesthesia group. Vender testified that based upon his review of the medical records, depositions, his knowledge, and the medical literature, there was no basis to find any negligent act for either Dooner or

Roche. Vender testified that the injury was unrelated to Martin's intubation because (1) no stylet was used in his intubation, (2) the intubation was done under normal circumstances on one attempt, (3) Martin's injury was in the anterior of his trachea and, in the literature reports of injuries to the trachea with intubation, the location of the injuries is almost always the posterior of the trachea, and (4) because tracheal injuries from intubation are not holes, as was Martin's, but typically longitudinal, anywhere from two to thirteen centimeters in length. Vender also testified that Martin's medical records indicated that his intubation was smooth and without problems and Martin's charge sheets indicated no charge for a stylet.

Vender also testified that it was exceptionally improbable that the injury was related to the right internal jugular line placement because all but one of the approaches for this procedure aim away from the trachea and one would not hit the front of the trachea with the needle but the side. He further testified that even if there was a needle stick into the trachea, you would not get necrotic tissue around a needle stick. Vender opined that to a reasonable degree of medical probability the actions of the anesthesia team would be inconsistent with Martin's injury.

In regard to Morgan's testimony that the distance between the vocal cords and the lesion was about four centimeters, Vender testified that four centimeters could be right at the sternoclavicular area. Vender also demonstrated this distance using photographs taken during an open heart surgery. On cross-examination by counsel for Morgan, Vender admitted that he could not tell how close Morgan was to the site of injury with the electrocautery equipment during Martin's surgery.

Dr. John Downs, an anesthesiologist from the University of South Florida in Tampa who is clinically active sixty percent as an anesthesiologist and critical care physician and thirty percent as an educator and administrator, testified as an expert for Morgan. Downs testified that he reviewed Martin's medical records and the depositions of other defendants and experts. Downs testified that the most likely cause of the injury to Martin's trachea was that the needle stuck his trachea during the right internal jugular stick. Downs testified that although the needle stick would not cause any significant damage to the trachea, in Martin, the needle hole served as a starting point for the bacteria to infiltrate the tissue and the hole grew larger due to the necrosis. Downs testified that nothing Morgan did caused the injury to Martin's trachea.

On cross-examination by appellant's counsel, Downs testified that he thought Roche inserted the needle straight and medially, not at a thirty-five-degree angle as she testified. Downs agreed that it would be below the standard of care in a controlled situation to push a stylet through the anterior portion of the trachea.

On cross-examination by counsel for Dooner and the anesthesia group, Downs admitted that penetrating the trachea with a needle would not be a deviation from the standard of care. Downs also testified that it was highly unlikely that Roche could have punctured the anterior portion of the trachea during intubation without knowing that she had done something wrong.

On redirect examination, Downs testified that, in reaching his conclusion that the right internal jugular stick caused Martin's injury, he considered the fact that the leak in Martin's endotracheal tube and the hole in the trachea were just a few millimeters lower than where Roche would have stuck the needle.

Dr. Thomas O'Grady, a Toledo thoracic and cardiovascular surgeon, who last performed heart bypass surgery in the mid-1980's but who still is clinically active more·than fifty percent of his time, testified as an expert for Dooner and the anesthesia group. O'Grady testified that he does surgeries which involve a median sternotomy, the same incision made in Martin, in order to gain surgical access to the chest. O'Grady opined that the care provided by Dooner and Roche conformed to the standard of care. O'Grady did not believe that Roche punctured Martin's trachea during the right internal jugular stick. O'Grady testified that, due to the anatomy of the trachea, the rigid anterior and lateral structure, and the pliable plastic of an endotracheal tube, it would take enormous force to penetrate Martin's trachea where the penetration occurred. O'Grady also testified that had the endotracheal tube perforated Martin's trachea the injury would have bled due to the anticoagulants that are given to patients undergoing CABG surgery and Dooner and Roche would have been suctioning blood through the endotracheal tube and there is no record of this in the anesthesia records.

On cross-examination by appellant's counsel, O'Grady admitted that during his deposition he had testified that he thought Martin's injury was caused by a cautery device. O'Grady demonstrated on a model that the electrocautery would be close to the trachea during the surgery and that the burn injury actually heated the balloon or cuff of the endotracheal tube and caused its deflation. On cross-examination by counsel for Morgan, O'Grady testified that he did not believe that Morgan violated the standard of care.

On redirect examination, O'Grady testified that the thymus gland in a sixty-four-year-old man would be atrophic and would probably not be seen and, therefore, there would be no anatomy which would preclude Morgan from injuring the area of the second and third cartilaginous ring.

The deposition of Dr. Lari Attai, a cardiac and thoracic surgeon from New York, an expert for Morgan, who has performed CABG surgery since 1969, was read to the jury. He was the co-author of the article entitled "An Unusual Cause of Compromise of the Airway During Cardiac Surgery" from the Journal of Cardiothoracic Anesthesia as well as the attending cardiac surgeon in the case.

He testified that the injury in that case occurred behind the seventh tracheal ring. Attai testified that it would be virtually impossible for a surgeon to perforate the third tracheal ring with an electrocautery during CABG surgery because it is too far out of the surgical field.

Morgan also testified on his own behalf using a fifteen-minute training video distilled from a two-hour CABG surgery. Morgan testified that the injury was above the sternal notch, beyond the surgical area. Morgan testified that no one on the surgical team caused the injury to Martin.

On cross-examination by appellant's counsel, Morgan testified that O'Grady's testimony regarding anatomy was incorrect. Morgan also testified that he was three to four inches from the area of injury during the surgery. He admitted that if he caused the injury that he would be guilty of malpractice. On redirect, Morgan testified that an inadvertent contact with the trachea could happen without medical malpractice.

On March 20, 2000, the jury returned a defense verdict in favor of all defendants. The judgment entry on the jury verdict was filed on April 13, 2000. Appellant filed a timely notice of appeal.

In the first assignment of error, appellant argues that the trial court erred in failing to instruct the jury and directing a verdict against appellant on the theories of bailment and/or fiduciary duty. This court finds no merit in this assignment of error.

R.C. 2305.11(D)(3) defines a medical claim. A medical malpractice claim involves a breach of a duty in the performance of medical services. *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 578–579, 613 N.E.2d 1014, 1020–1021. Thus, no separate breach-of-fiduciary-duty claim is necessary. Furthermore, appellant's bailment theory is flawed as Martin was not bailed property. See R.C. 1307.01(A)(6); *Brown v. Stepping Stones Ctr. for Handicapped* (Dec. 22, 1993), Hamilton App. Nos. C–920802, C–920933 and C–920934, unreported, 1993 WL 538910.

Accordingly, appellant's first assignment of error is found not well taken.

We will address appellant's second and third assignments of error together as they involve similar issues. In the second assignment of error, appellant argues that the trial court erred by nullifying/negating the *res ipsa loquitur* instruction by giving the first interrogatory.[2] In the third assignment of error, appellant

---

2. The first interrogatory stated: ' "What caused the injury to Richard H. Martin's trachea? (Choose one)

 "A. _____ Styletted Intubation

 "B. _____ Unstyletted Intubation

argues that the trial court erred by nullifying/negating the *res ipsa loquitur* instruction with another instruction.[3] This court finds no merit in either assignment of error.

 During trial, the trial court met with the counsel for all the parties in regard to the proposed jury instructions and interrogatories. Counsel for appellant stated the following objection in regard to the first interrogatory:

"I object to interrogatory number 1 on the basis that it's not calling for ultimate conclusions but it's basically intended to check specific evidentiary findings which I believe is not allowed in Ohio, and my authority is Freeman versus Norfolk Southern Railroad. And therefore, I would object to that interrogatory."

Counsel for appellant did not object to the first interrogatory on the basis now argued on appeal: that the interrogatory negates/nullifies the *res ipsa loquitur* instruction.

 The failure to object to an interrogatory constitutes waiver of any error. *Boewe v. Ford Motor Co.* (1992), 94 Ohio App.3d 270, 279, 640 N.E.2d 850, 855–856. A reviewing court will not consider any error which a party failed to bring to the trial court's attention at a time when that error could have been avoided or corrected by the court. *LeFort v. Century 21–Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 123, 512 N.E.2d 640, 642–643; *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 70 O.O.2d 123, 322 N.E.2d 629.

A careful review of the record reveals that appellant failed to object to the first interrogatory on the basis that is now argued on appeal: that the interrogatory

---

"C. _____ Insertion of the right internal jugular (RIJ) line

"D. _____ Electro-cautery

"E. _____ Anatomical anomaly or weakness

"F. _____ Infection

"G. _____ Other, please identify: _____

"H. _____ We can not determine, and we believe negligence occurred.

"I. _____ We can not determine what caused the injury, but plaintiff has failed to prove it was caused by negligence."

3. The trial court gave the following instruction:

"TRIAL COURT: "If you find that plaintiff failed to prove that any defendant was negligent, or if you find that plaintiff failed to prove that such negligence proximately caused Richard Martin's death, or *if you are unable to determine how the injuries and death happened, then your verdict must be for all defendants. Let me improve on that. Or if you are unable to determine how the injuries and death happened and then determine—then you cannot determine whether there was negligence then your verdict must be for all defendants.*" (Emphasis added.)
Appellant cited the emphasized portion as the basis for the third assignment of error.

negated/nullified the *res ipsa loquitur* instruction. At trial, appellant objected to the first interrogatory on the basis that it "intended to check specific evidentiary findings" and cited *Freeman v. Norfolk & W. Ry. Co.* (1994), 69 Ohio St.3d 611, 635 N.E.2d 310, for the proposition that a jury interrogatory must be drafted to evoke a finding on a determinative issue.[4]

Appellant failed to object to the first interrogatory on the basis that the interrogatory negated/nullified the *res ipsa loquitur* instruction and, thus, appellant failed to present the opportunity to the trial court to correct this claimed error. Further, because appellant failed to object to the first interrogatory on the basis now raised on appeal, he has failed to preserve this error for this court's review.

■ Assuming *arguendo* that an objection had been made on the record, appellant's argument would still have no merit. Civ.R. 49(B) provides:

"The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law."

■ Thus, the form and content of a submitted interrogatory is a matter left to the sound discretion of the trial court. *Ragone v. Vitali & Beltrami, Jr., Inc.* (1975), 42 Ohio St.2d 161, 71 O.O.2d 164, 327 N.E.2d 645, paragraph one of the syllabus; *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 592 N.E.2d 828, paragraph three of the syllabus.

Although appellant argues on appeal that the first interrogatory negated the *res ipsa loquitur* instruction, this court finds that the first interrogatory included an option that was consistent with *res ipsa loquitur*: option H. Option H provided:

---

4. In *Freeman v. Norfolk & W. Ry. Co.* (1994), 69 Ohio St.3d 611, 613, 635 N.E.2d 310, 313, the Ohio Supreme Court stated that the purpose of an interrogatory is to test the jury's thinking in resolving an ultimate issue so as not to conflict with its verdict. Although interrogatories may be addressed to issues of mixed law and fact or issues of fact only, the issues must be ultimate and determinative in character. *Id.* Therefore, a properly posed interrogatory is one which necessitates a finding of a particular question of fact and is of a determinative nature rather than one which invites responses of a mere probative or evidentiary quality. *Ragone v. Vitali & Beltrami, Jr., Inc.* (1975), 42 Ohio St.2d 161, 71 O.O.2d 164, 327 N.E.2d 645, paragraph on of the syllabus. In the case *sub judice*, the first interrogatory was drawn as to test the jury's assessment of the determinative issues presented. *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.* (1986), 28 Ohio St.3d 333, 336, 28 OBR 400, 402, 504 N.E.2d 415, 417–418.

"We can not determine [what caused the injury to Richard H. Martin's trachea], and we believe negligence occurred."

■ As a general rule, the weight to be given the evidence and the credibility of witnesses are primarily for the trier of fact to decide. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The trier of fact is not required to believe any witness or expert. The credibility of witnesses is within the province of the trier of fact. In this case, the jury was clearly within its discretion to believe any of the experts. Although appellant presented experts who testified that the injury to Martin's trachea occurred due to negligence, other experts testified that the injury to Martin's trachea could have occurred in the absence of negligence.

■ "The essential purpose to be served by interrogatories is to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial." *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.* (1986), 28 Ohio St.3d 333, 336–337, 28 OBR 400, 402–403, 504 N.E.2d 415, 418. The first interrogatory provided all the options necessary to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial. Thus, this court finds that the trial court did not err in giving the first interrogatory to the jury.

Accordingly, appellant's second assignment of error is found not well taken.

■ In the third assignment of error, appellant argues that the trial court erred in instructing the jury. See footnote 3. During trial, the trial judge and the attorneys for all parties reviewed the proposed jury instructions submitted by all the parties. After the trial judge read the instructions to the jury, the trial judge conducted a bench conference with the attorneys and asked for any objections. Appellant's counsel renewed his objections to the omission of instructions as to bailment and breach of fiduciary duty as theories of recovery but did not object otherwise.

The law regarding contesting improper jury instructions on appeal is clearly articulated in Civ.R. 51(A), which provides:

"[A] party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. * * *"

■ Consequently, when a party fails to object to the giving of or the failure to give a jury instruction before the jury retires to consider a verdict, a party

may not assign as error the giving of or the failure to give such instructions. *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 24 O.O.3d 316, 436 N.E.2d 1001. In addition, the reason for requiring particularity in the objection is to give the trial court the opportunity to correct a mistake before the jury retires. *R.H. Macy & Co., Inc. v. Otis Elevator Co.* (1990), 51 Ohio St.3d 108, 110, 554 N.E.2d 1313, 1315–1316. In *Leber v. Smith* (1994), 70 Ohio St.3d 548, 552, 639 N.E.2d 1159, 1162, the Ohio Supreme Court stated:

"Buckeye Union did not object to the trial judge's informing the jury that the judgment against the board in *Leber I* [*Leber v. Smith* (C.A.6 1985), 773 F.2d 101] was binding on the jury in *Leber II* [the instant cause]. Instead, Buckeye Union objected to another portion of the same jury instruction that informed the jury of the trial court's findings in the declaratory judgment action. *Because Buckeye Union's reason for objecting to the jury instruction is not the same as its reason for objecting at trial, Buckeye Union was precluded from arguing on appeal that this instruction was improper.*" (Emphasis added.)

"In considering whether specific portions of the trial court's instructions complained of were improper, the instructions as a whole must be reviewed." *Wagenheim v. Alexander Grant & Co.* (1983), 19 Ohio App.3d 7, 16, 19 OBR 71, 81, 482 N.E.2d 955, 966; *Becker v. Lake Cty. Mem. Hosp. West* (1990), 53 Ohio St.3d 202, 208, 560 N.E.2d 165, 170–171. In the case *sub judice*, the trial judge may have made a slip of the tongue and said "then" instead of "and" when the trial judge rephrased this jury instruction. However, the instructions when taken as a whole were not confusing or misleading. The trial judge correctly instructed the jury as to the doctrine of *res ipsa loquitur*.

In regard to the application of the plain error doctrine in civil cases, the Ohio Supreme Court in *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus, held:

"In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself."

The court, after noting that failure to timely advise the trial court of possible error by objection or otherwise results in a waiver of the issue for purposes of appeal, noted:

"While invocation of the plain error doctrine is often justified in order to promote public confidence in the judicial process, '[it is doubtful that] the public's confidence in the jury system is undermined by requiring parties to live with the results of errors that they invited, even if the errors go to "crucial matters." In

fact, the idea that parties must bear the cost of their own mistakes at trial is a central presupposition of our adversarial system of justice.' *Montalvo v. Lapez* (1994), 77 Hawaii 282, 305, 884 P.2d 345, 368 (Nakayama, J., concurring in part and dissenting in part). Moreover, the determination of a miscarriage of justice is often subjective. Litigants whose cases have been thwarted by statutes of limitations or whose appeals have been dismissed for failure to timely file a notice of appeal may believe they have suffered a miscarriage of justice. Nevertheless, it is well established that failure to follow procedural rules can result in forfeiture of rights.

"* * *

"We do not hold that application of the plain error doctrine may *never* be appropriate in civil cases. However, we do reaffirm and emphasize that the doctrine is sharply limited to the *extremely rare* case involving *exceptional* circumstances where the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself. [Emphasis *sic.*]

 "Exceptions to the requirements of Civ.R. 51(A) should be granted 'only in circumstances where the error has seriously affected the basic fairness, integrity, or public reputation of the judicial process.' *Yungwirth v. McAvoy* (1972), 32 Ohio St.2d 285, 288, 61 O.O.2d 504, 505–506, 291 N.E.2d 739, 741. *The plain error doctrine should never be applied to reverse a civil judgment simply because a reviewing court disagrees with the result obtained in the trial court, or to allow litigation of issues which could easily have been raised and determined in the initial trial.* [Emphasis added.]" *Id.,* 79 Ohio St.3d at 121–122, 679 N.E.2d 1099, 1103–1104.

This court does not find that the case *sub judice* to be an "extremely rare case involving exceptional circumstances where the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself" or that an "error has seriously affected the basic fairness, integrity, or public reputation of the judicial process." *Id.* at 122, 679 N.E.2d at 1104. Therefore, this court will not apply the plain error doctrine to this case.

Accordingly, appellant's third assignment of error is found not well taken.[5]

---

**5.** Dooner and the anesthesia group set forth two cross-assignments of error for this court's consideration in the event appellant's assignments of error were found well taken. As appellant's assignments of error were found not well taken, this court need not address these cross-assignments of error.

On consideration whereof, the court affirms the judgment of the Lucas County Court of Common Pleas. Appellant is ordered to pay the court costs of this appeal.

*Judgment affirmed.*

PIETRYKOWSKI, P.J., and MELVIN L. RESNICK, J., concur.