SCATAMACCHIO et al.,

v.

WESTERN RESERVE HEALTHCARE a.k.a. Northside
Medical Center et al., Appellees;

Logozzo, Admr., et al., Appellants, et al.

[Cite as *Scatamacchio v. W. Res. Care Sys.*, 161 Ohio App.3d 230, 2005-Ohio-2690.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 03 MA 212.

Decided May 24, 2005.

Paul R. Giba; Richard J. Schubert & Assoc., P.C., and Richard J. Schubert, for appellants.

Comstock, Springer & Wilson and William Scott Fowler, for appellee Western Reserve HealthCare.

Reminger & Reminger Co., L.P.A., Brian A. Meeker, and D. Cheryl Atwell, for appellees.

WAITE, Judge.

{¶ 1} Appellant, Mariann Logozzo, administrator of the estate of Mary A. Scatamacchio, timely appeals an October 15, 2003 decision of the Mahoning County Court of Common Pleas. The court denied appellant's motion for judgment notwithstanding the verdict or in the alternative for a new trial following the defense verdict in her jury trial. For the following reasons, the trial court did not err in denying appellant's motion and we affirm the judgment in full.

{¶ 2} This matter arises from a medical negligence claim originally filed by the decedent relative to the alleged misdiagnosis of her malignant mesothelioma by appellee, Dr. Gary K. Segall. Dr. Segall, a pathologist, interpreted the tissue biopsy from decedent's tumor at Western Reserve HealthCare System, n.k.a. Forum Health, Northside Medical Center (also an appellee). Dr. Segall operated the pathology department at Northside. After Scatamacchio's death, her daughter, Mariann Logozzo, filed a wrongful-death action. The two cases were consolidated for trial.

{¶ 3} Both sides presented certain expert medical testimony at trial. The jury rendered a unanimous defense verdict. Appellant asserts four assignments of

error on appeal arising from the trial court's denial of her motion for judgment notwithstanding the verdict or for a new trial.

{¶ 4} The following is a summation of the evidence presented at trial.

{¶ 5} The decedent underwent a needle biopsy on October 30, 1996, after her pulmonologist detected a mass enveloping 80 percent of her chest cavity. Upon examining the biopsy slides, Dr. Segall diagnosed decedent's tumor as malignant mesothelioma. Decedent's clinicians relied on this diagnosis and advised decedent that she would die in less than one year and there were no available treatment options. Decedent previously had a tumor that was removed in 1974.

{¶ 6} Decedent's medical condition declined shortly after this diagnosis. She was suffering from congestive heart failure. Appellant Logozzo was advised that her mother had about one week to live; however, decedent was hospitalized for more than three months. She required a tracheostomy, a feeding tube, and a ventilation machine but was eventually released from the hospital on January 31, 1997.

{¶ 7} Decedent's condition gradually improved, and by June 1997, she was taken off the respirator. Based on this unexpected improvement, which was inconsistent with the October 1996 diagnosis, appellant's pulmonary specialist, Dr. Kartan, sought further testing of the initial biopsy slides. The slides were sent to the "preeminent" pathology experts at the Armed Forces Institute of Pathology for evaluation. This pathology review revealed that the tumor was probably a benign localized fibroid tumor. However, the report did not rule out malignancy; it indicated "questionable malignant."

{¶ 8} Appellant then took her mother to a physician in Pittsburgh. This doctor did not testify at trial, but according to appellant, he advised them that surgery was an option. However, he did not recommend surgery to her based on decedent's age and the extent of her health problems during the previous year. Decedent never pursued surgical options.

{¶ 9} In January 2000, decedent was hospitalized with pneumonia. She died on February 4, 2000.

{¶ 10} Appellant's first assignment of error asserts:

{¶ 11} "The trial court erred in denying plaintiff-appellant's motion for judgment N.O.V. And/or motion for new trial because the verdict of the jury was against the weight of the evidence."

{¶ 12} A motion for judgment notwithstanding the verdict ("JNOV") tests the legal sufficiency of the evidence and presents a question of law. *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896; *Altmann v.*

*Southwyck AMC–Jeep–Renault, Inc.* (1991), 76 Ohio App.3d 92, 95, 601 N.E.2d 122.

{¶ 13} An appellate court reviews a motion for JNOV de novo. *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244, 257, 741 N.E.2d 155. In ruling on a motion for JNOV, the evidence is construed most strongly in favor of the nonmovant, who is also given the benefit of all reasonable inferences from the evidence. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 430 N.E.2d 935. A court must not weigh the evidence or the credibility of the witnesses when reviewing such a motion. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 28 OBR 410, 504 N.E.2d 19, syllabus. Further, a motion for JNOV should be denied if there is substantial evidence upon which reasonable minds could come to different conclusions on the essential elements of the claim. *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 344 N.E.2d 334.

{¶ 14} Three elements must be proven in order to maintain a medical malpractice or professional negligence cause of action. First, a plaintiff must establish the applicable standard of care recognized by the medical community, usually through expert testimony. Second, a plaintiff must show a negligent failure on the part of the physician or hospital to meet the standard of care or render treatment conforming to this standard. Finally, a direct causal connection must be demonstrated between the medically negligent act and the injury. *Starkey v. St. Rita's Med. Ctr.* (1997), 117 Ohio App.3d 164, 690 N.E.2d 57; *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673.

{¶ 15} The expert testimony must explain what a medical professional of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances. Id. at 131, 75 O.O.2d 184, 346 N.E.2d 673.

{¶ 16} Appellant's medical negligence theory at trial asserted that Dr. Segall failed to meet the standard of care when he diagnosed decedent's tumor as malignant mesothelioma. Appellant stressed that the issue was not whether decedent's tumor was benign or malignant, but that Dr. Segall diagnosed the tumor as inoperable mesothelioma. Appellant claimed that had decedent's tumor been correctly diagnosed as a fibrous tumor, it would have been operable and potentially curable.

{¶ 17} Appellant's cause of action hinged on the argument that the decedent's misdiagnosis delayed her from considering the surgical option of having the mass removed and that this delay precluded her from exercising that option.

{¶ 18} Appellant first argues in support of her JNOV request that the jury's verdict was contrary to law because it found that Dr. Segall's misdiagnosis did

not constitute negligence. In their first interrogatory, the jury concluded that Dr. Segall was not negligent.

{¶ 19} Again, in order to prove actionable negligence, appellant must establish the applicable standard of care, that appellees failed to meet that standard, and that decedent suffered injury as a direct and proximate result. *Bruni*, 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, paragraph one of the syllabus.

{¶ 20} The first jury interrogatory presented the question: "Do you find by a preponderance of the evidence that the Defendant Dr. Gary SeGall [sic] was negligent?" The interrogatory did not define negligence. Thereafter, if six or more of the jurors answered the first question in the affirmative, they were directed to answer the second interrogatory that asked: "Do you find by a preponderance of the evidence that the negligence of the Defendant Dr. Gary SeGall [sic] was a proximate cause of the death of Mary Scatamacchio?"

{¶ 21} The manner in which these interrogatories were drafted certainly could have been clearer. The word "negligence" is a term of art, made up of several components. The first interrogatory should have asked whether the jury found that Dr. Segall met his standard of care. However, neither party objected to the nature of these interrogatories.

{¶ 22} The trial court provided the following general jury instruction explaining medical negligence prior to reading the jury interrogatories:

{¶ 23} "In order to establish medical negligence, that is a breach of the duty by medical providers to exercise ordinary carry [sic], a plaintiff must show by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician exercising ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician would have done under like or similar conditions or circumstances, and that the injury complained of was a direct and proximate result of such doing or failure to do one or more of such particular things."

{¶ 24} Thereafter, the trial court instructed that if the jury finds that the defendant was negligent, then it must next determine whether that negligence was the proximate cause of the decedent's injuries or death. This is also somewhat confusing, since the legal definition of negligence encompasses proximate cause.

{¶ 25} Notwithstanding the less than clear jury instructions and interrogatories, when viewing the evidence in a light most favorable to appellees, the jury's decision in this matter is supported with sufficient evidence. Based on our de novo review of the evidence, Dr. Segall's testimony, if believed, supports the

conclusion that he did not breach the standard of care in rendering decedent's diagnosis. Thus, it likewise supports the jury's answer to the first interrogatory.

{¶ 26} Several expert physicians testified for both sides at trial. Appellant's expert pathologist, Dr. Hammar, described the various tests a pathologist conducts in an effort to profile a tumor and render a diagnosis. Pathologists are asked to narrow down the type of tumor, since various tumors have very specific therapies. Dr. Hammar indicated that it is very important to diagnose a mesothelioma since "there's no good therapy for that type of cancer where there might be a good therapy for another type of tumor that might look like a mesothelioma."

{¶ 27} Dr. Hammar indicated that he made the same observations as Dr. Segall. However, Dr. Hammar did not agree with Dr. Segall's conclusion that decedent's tumor met the tests for malignant mesothelioma. Dr. Hammar did not, however, disagree with Dr. Segall's description of the tumor as malignant.

{¶ 28} Dr. Hammar testified that Dr. Segall did not meet the standard of care of a prudent pathologist for several reasons. Dr. Hammar relied on the fact that 80 percent of sarcomatoid mesotheliomas express keratin, and decedent's did not; decedent's prior tumor was a localized benign fibrous tumor; and mesotheliomas are rare in women. Based on these indicators, he felt that more information and analysis were required, including identifying the distribution of the tumor.

{¶ 29} Appellee Dr. Segall testified on his own behalf. Dr. Segall and Dr. Hammar were the only pathologists to testify at trial. Dr. Segall testified that a mesothelioma is a category of tumors, which includes all tumors involving the chest lining. He also testified that there are at least 12 different types of mesotheliomas, and each can be benign or malignant. Specifically, a localized fibroid tumor is a type of mesothelioma.

{¶ 30} Dr. Segall further explained that a mesothelioma can be diffuse or localized. A tumor described as localized is either a small tumor or one growing in a certain area, whereas "diffuse" suggests that the tumor is encasing the lung or is a much larger tumor. However, he testified that from his perspective as a pathologist, he does not determine whether a tumor is localized or diffuse since he does not read the x-rays and interpret them. He indicated that making that determination is the radiologist's function. Dr. Segall explained that it is the clinician's role to assess the other physicians' analyses and to make the final diagnosis based on a compilation of the available information.

{¶ 31} Based on his experience and his review of the decedent's pathology slides, Dr. Segall believed that the decedent's tumor was a mesothelioma. He also concluded that the tissue demonstrated malignancy to a reasonable degree of

medical certainty. He listed at least four independent factors indicating malignancy.

{¶ 32} Dr. Segall also explained that there is major significance in the fact that a patient's tumor does worsen and the patient is alive almost one year after diagnosis. This information is of great significance to a pathologist in assessing the type of mesothelioma since some are very aggressive.

{¶ 33} Based on the information available to Dr. Segall at the time of his diagnosis, he did not subtype the tumor. He simply concluded that it was a mesothelioma because he "had no way of knowing was it going to be growing fast or was it not and so forth. Knowing almost a year later that it had not grown, then that would—[he would] totally agree that would eliminate probably * * * what's also referred to as the diffuse form of malignant mesothelioma. * * * So that's a very, very critical factor." Dr. Segall never conceded that his initial diagnosis, based on the information available at the time, was in error. In fact, Dr. Segall's testimony substantiated his conclusions based on all available information at the time he made his diagnosis.

{¶ 34} Dr. Hammar testified that at one point, a localized fibrous tumor was described as a localized mesothelioma. However, Dr. Hammar testified that that was many years ago and that the general "mesothelioma" terminology had been discarded. Thus, the record reflects that he disagreed with Dr. Segall's generalized mesothelioma description.

{¶ 35} As for the first two medical-negligence elements, standard of care and breach of that standard, there was evidence introduced to support both sides' contentions. Dr. Segall stood by his original diagnosis based on the available information at the time. Therefore, in construing the evidence most strongly in appellees' favor because there was evidence to support both contentions, the trial court did not err in denying appellant's motion for JNOV.

{¶ 36} As for the third and final element in a medical-negligence action, proximate cause, appellant claimed that the decedent should have had the opportunity to have the tumor surgically removed or to at least explore that option. Appellant presented Dr. Hammar's testimony in support of this contention. He testified that all localized fibrous tumors should be surgically removed if possible.

{¶ 37} While Dr. Hammar testified that the best treatment for the type of tumor decedent had would have been to surgically remove it, Dr. Hammar did not have an opinion relative to whether surgery would have been feasible for the decedent. Dr. Hammar is not a surgeon, and he would have deferred to the treating physicians on this issue.

{¶ 38} Appellant also had a pulmonary specialist, Dr. Laufe, testify at trial based on his independent review of decedent's medical records. Dr. Laufe testified that decedent should have had surgery to remove the tumor within 48 hours of the diagnosis. Dr. Laufe believed that decedent had only mild surgical risks, including her elevated pulmonary artery pressure, a collapsed lung, and diabetes. Dr. Laufe testified that he could have gotten decedent into surgery within that 48–hour window. However, Dr. Laufe conceded that the surgery would have been contingent upon a surgeon's assessment of the preoperative risks, and he was not a surgeon.

{¶ 39} Dr. Laufe also testified that once decedent fell gravely ill after her diagnosis, her respiratory failure and pneumonia would have precluded any surgical options.

{¶ 40} Appellees' expert pulmonary specialist, Dr. Repsher, testified that decedent's symptoms at the time of her malignant-mesothelioma diagnosis reflected that she was suffering from biventricular congestive heart failure, which raised preoperative concerns. These concerns were present before the alleged misdiagnosis. He concluded that decedent was at a very high risk for any surgical procedures even at the time of diagnosis, and whether or not the tumor was benign or malignant would not have affected his view of the decedent's pulmonary risks relative to surgery.

{¶ 41} Dr. Repsher further testified that the ultimate cause of decedent's death was not related to her tumor; he concluded that it was clearly from heart failure.

{¶ 42} In addition, appellees' expert cardiothoracic surgeon, Dr. Botham, testified that if decedent's tumor was not a malignant mesothelioma and was operable, then the surgery consults would have taken three to four weeks under the best of circumstances because she was an outpatient. Assuming the tumor was operable, decedent had an 80 to 90 percent mortality rate based on her symptoms and medical history prior to her alleged misdiagnosis. He testified, "With a hundred percent probability, I would not have offered [decedent] operative intervention."

{¶ 43} Thus, conflicting evidence was presented at trial as to whether the claimed misdiagnosis affected decedent's chances for surgical intervention. However, appellant failed to provide any evidence as to whether any surgeon under the circumstances would have recommended surgery for decedent. To the contrary, appellees' expert cardiothoracic surgeon stated that decedent would have been a poor surgical candidate based on her hypertension, borderline diabetes, and other health concerns.

{¶ 44} Based on the foregoing, even if we assume that appellees failed to meet the standard of care in rendering the diagnosis of malignant mesothelioma,

appellant did not establish that decedent was proximately harmed as a result. Therefore, any argument that the jury erred in their decision to answer the first interrogatory in the negative can only be harmless. Appellant's argument in this regard lacks merit and is overruled.

{¶ 45} Appellant next claims under this assignment of error that the opening statement of trial counsel for Western Reserve HealthCare should constitute a judicial admission. Appellant asserts that counsel admitted that decedent's tumor was a benign fibrous tumor, and therefore, negligence was admitted as a matter of law.

{¶ 46} The arguments or statements of counsel may be considered judicial admissions in certain instances. *Hake v. George Wiedemann Brewing Co.* (1970), 23 Ohio St.2d 65, 52 O.O.2d 366, 262 N.E.2d 703. However, in order to constitute a judicial admission, counsel's statements "must be distinct and unequivocal, and be, by intention, an act of waiver relating to the opponent's proof of fact, and not merely a statement of assertion or concession, made for some independent purpose." *Shepler v. Love* (Sept. 14, 2001), 6th Dist. No. H–00–022, 3, 2001 WL 1104811, citing *Carl & Gene Towing Serv., Inc. v. Shortway Lines* (Mar. 26, 1982), 6th Dist. No. L–81–265, 2, 1982 WL 6322.

{¶ 47} For example, the Ohio Supreme Court held that "defendant's counsel's assertion in opening statement that the evidence would disclose that an empty beer keg accidentally slipped from hands of defendant's employee, constituted a judicial admission sufficient to establish exclusive management and control on part of defendant at time of injury." *Courtyard on Coventry v. Giambrone Masonry, Inc.*, (Mar. 9, 2000), 8th Dist. No. 75271, 6, 2000 WL 263737, citing *Hake*, 23 Ohio St.2d 65, 52 O.O.2d 366, 262 N.E.2d 703.

{¶ 48} Appellant claims that the alleged admission in this case was made by counsel for Western Reserve HealthCare in his opening statement when he stated:

{¶ 49} "And sometimes these cases are tough because we're looking at everything retrospectively. But when we look back and we realize this is a benign fibrous tumor with some malignant characteristics, or it's a malignant tumor, it hasn't been growing very fast. She didn't wake up one morning with this, okay? This is a process that takes time."

{¶ 50} Although counsel's opening statement may appear to concede that this tumor was likely a benign fibrous tumor with malignant characteristics, the reference is clearly made in retrospect. Medical negligence is based on all the facts before defendants at the time, not in hindsight. Further, appellant takes this alleged admission out of context in her brief. This statement was clearly not

intended as a judicial admission of negligence, and it does not have the characteristics of a judicial admission. Therefore, this argument lacks merit.

{¶ 51} Appellant's alternative motion for a new trial argues that the verdict was not sustained by the manifest weight of the evidence. This argument falls under Civ.R. 59(A)(6), which authorizes a court to grant a new trial on all or part of the issues if the judgment is not sustained by the weight of the evidence.

{¶ 52} The abuse-of-discretion standard governs appellate review of a decision whether to grant a new trial. *Antal v. Olde Worlde Products, Inc.* (1984), 9 Ohio St.3d 144, 145, 9 OBR 392, 459 N.E.2d 223; *Jenkins v. Krieger* (1981), 67 Ohio St.2d 314, 21 O.O.3d 198, 423 N.E.2d 856. An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140.

{¶ 53} As previously discussed, there was some evidence presented at trial to support appellant's contention that appellees failed to meet the standard of care in rendering the malignant mesothelioma diagnosis. However, the evidence on this issue was not solely in appellant's favor. Evidence also exists to support appellees' contention that there was no negligence in this regard.

{¶ 54} Further, even assuming that the diagnosis was negligently rendered, appellant did not establish that decedent was proximately harmed as a result. Appellant had no surgeon testify that surgery would have been a viable option for decedent had the initial diagnosis not been malignant mesothelioma. Appellant argues that surgery was decedent's "last, best chance" and that her claims are based on appellees' failure to give decedent her chance. Thus, appellant claims that because no surgeon was consulted due to the alleged negligence, it was not necessary to have an expert's testimony in this regard. Appellant is mistaken in this belief. If, as she claims, surgery may have saved decedent, expert testimony in this regard is critical to a determination as to whether it was a viable option in order to establish proximate cause. Without such expert testimony, appellant's arguments in this regard are speculative at best, especially in the light of evidence introduced that the decedent would likely not have been a candidate for surgery.

{¶ 55} Based on the foregoing, the trial court did not abuse its discretion in failing to grant appellant a new trial. The verdict was sustained by the weight of the evidence. Appellant's first assignment of error is overruled in its entirety.

{¶ 56} Appellant's second assignment of error claims:

{¶ 57} "The trial court erred in denying plaintiff-appellant's motion for judgment N.O.V. Inasmuch as the verdict of the jury was inadequate as a matter of

law and appears to have been made under the influence of passion and/or prejudice."

{¶ 58} Appellant claims that this verdict must be overturned since it "shocks the sensibilities" because this was a case that hinged not on whether appellees were negligent, which appellant takes as a given, but whether their negligence proximately caused harm to decedent.

{¶ 59} Appellant is evidently attempting to claim in this assignment that the evidence was insufficient to support the jury's verdict. In support of this argument, appellant again refers to appellees' alleged admission of misdiagnosis in counsel's opening statement. However, as earlier stated, appellant herself is in error in this reference because appellant took counsel's statement out of context. There was no judicial admission on the record.

{¶ 60} The only other fact that appellant raises in this assignment of error is that decedent's keratin test was negative, and thus malignant mesothelioma should have been excluded as a diagnosis. However, appellant's expert pathologist, Dr. Hammar, testified that 80 percent of sarcomatoid mesotheliomas express keratin and decedent's did not. Consequently, and based on the statement of appellant's own expert, 20 percent of sarcomatoid mesotheliomas must not express keratin. Thus, there was sufficient evidence supporting the defense verdict even on this issue.

{¶ 61} Based on the foregoing, appellant's second assignment of error lacks merit and is overruled.

{¶ 62} In appellant's third assignment of error, she argues:

{¶ 63} "The trial court erred in refusing to grant plaintiff's motion for judgment N.O.V. Due to the prejudice caused by the defendant-appellee Segal's [sic] misleading and inaccurate testimony regarding CD–34 and its approval by the FDA."

{¶ 64} This assignment concerns an allegedly available test, i.e., CD–34, that Dr. Segall did not perform prior to rendering his diagnosis of malignant mesothelioma.

{¶ 65} Appellant claims that the trial court erred in failing to grant her a new trial based on Dr. Segall's testimony on this issue. He testified that CD–34 was an "investigational research-only type of antibody" that had not been approved by the FDA at the time for diagnostic purposes. Appellant claims that this testimony was not only incorrect, but also prejudicial since this information was not in Dr. Segall's expert report and not referred to in his discovery deposition.

{¶ 66} However, Dr. Segall's testimony concerning the CD–34 test rebutted Dr. Hammar's testimony. Dr. Hammar testified that the CD–34 test was available at

the time of decedent's diagnosis. He also stated that this test would have helped to assist in decedent's diagnosis.

{¶ 67} Notwithstanding the availability of the test, Dr. Hammar stated on cross-examination that he did not believe that Dr. Segall acted below the standard of care in not conducting several tests, including the CD–34 test.

{¶ 68} In addition, appellant did not object to this testimony at trial. She also failed to raise this issue at the JNOV hearing. A party who fails to object at trial waives error on appeal relative to that testimony unless there was plain error. *State v. Ballew* (1996), 76 Ohio St.3d 244, 251, 667 N.E.2d 369. "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894.

{¶ 69} Based on Dr. Hammar's conclusion that Dr. Segall's actions in not conducting this test did not fall below the standard of care, there was no prejudice to appellant. This assignment of error lacks merit and is overruled.

{¶ 70} Appellant's final assignment of error asserts:

{¶ 71} "The trial court erred as a matter of law in failing to strike the testimony of defendant expert Dr. Mark J. Botham inasmuch as he failed to testify within the standard of care and simply stated what he would have done under the circumstances, not what a reasonable surgeon would have done under the circumstances."

{¶ 72} Appellant's final argument at the JNOV hearing was that appellees' expert, Dr. Botham, should not have been allowed to testify at trial since he never discussed the standard of care prior to giving his opinion.

{¶ 73} Appellant did not object to Dr. Botham's testimony at trial, but following his testimony, appellant orally requested the trial court to strike Dr. Botham's testimony. Appellant's counsel asserted that Dr. Botham testified only as to what he, personally, would have done and not as to what an ordinary surgeon of the same skill and diligence would have done under similar circumstances. Therefore, appellant claimed that Dr. Botham's testimony was legally insufficient. Appellant reiterates this argument on appeal.

{¶ 74} Again, an appellate court will not disturb a trial court's evidentiary ruling unless it finds an abuse of discretion, i.e., that its decision was unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 75} In support of this error, appellant directs this court's attention to the three medical-negligence elements. As set forth previously, a plaintiff must establish the applicable standard of care by expert testimony. Next, he must

prove that the defendant physician failed to meet that standard of care and that the patient was proximately injured as a result of that failure. *Starkey*, 117 Ohio App.3d 164, 690 N.E.2d 57; *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673.

{¶ 76} In the instant matter, Dr. Botham, a cardiothoracic surgeon, testified on the issue of proximate cause. His testimony was elicited to demonstrate that the decedent was not a candidate for surgery even prior to the alleged misdiagnosis. The record reflects that he gave his medical opinion on this issue to a reasonable degree of medical certainty.

{¶ 77} Appellant presented no evidence to the contrary, and appellant does not challenge Dr. Botham's credentials or conclusion.

{¶ 78} In addition, Dr. Botham was not a pathologist, and he did not testify about Dr. Segall's standard of care as a pathologist. Instead, Dr. Botham concluded with 100 percent probability that decedent was not a candidate for surgery at any point in the time period at issue and he would not have offered decedent any surgical intervention.

{¶ 79} Based on the foregoing, the trial court did not act arbitrarily or unconscionably in denying appellant's motion to strike this testimony. Therefore, this assignment of error also fails and is overruled.

{¶ 80} In conclusion, all of appellant's assignments of error are overruled, and the trial court's judgment is hereby affirmed.

Judgment affirmed.

DONOFRIO, P.J., and DEGENARO, J., concur.