[Cite as *Taylor v. Collier*, 2015-Ohio-4099.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| GLENN TAYLOR | ) | CASE NO. 13 MA 117 |
| | ) | |
| PLAINTIFF-APPELLANT | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| BERT D. COLLIER, M.D. | ) | |
| | ) | |
| DEFENDANT-APPELLEE | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from the Court of Common Pleas of Mahoning County, Ohio Case No. 2011 CV 818

JUDGMENT: Affirmed.

APPEARANCES:

For Plaintiff-Appellant: Atty. Patrick C. Fire
721 Boardman-Poland Road
Boardman, Ohio 44512

For Defendant-Appellee: Atty. Matthew Van Such
Harrington, Hoppe & Mitchell, Ltd.
2235 E. Pershing Street, Suite A
Salem, OH 44460

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Carol Ann Robb

Dated: September 30, 2015

WAITE, J.

{¶1} Appellant Glenn Taylor appeals both the July 11, 2013 jury verdict in favor of Appellee Dr. Bert Collier in this medical malpractice case, and the October 23, 2013 judgment entry denying his motion for judgment notwithstanding the verdict and motion for a new trial. Appellant argues that the jury's verdict in favor of Appellee is contrary to law in light of the jury's finding that Appellee negligently misinterpreted Appellant's x-ray. Additionally, Appellant argues that the trial court erred in denying his motion for a new trial based on three separate errors. First, Appellant asserts that the trial court erred in admitting testimony regarding Appellant's status as a non-compliant patient as such testimony was irrelevant and prejudicial. Second, Appellant argues that Dr. Howe was permitted to testify as to the standard of care even though such testimony exceeded the scope of his report. Third and finally, Appellant argues that the jury's verdict is against the manifest weight of the evidence.

{¶2} In response, Appellee asserts that Appellant has failed to provide a complete appellate record. Thus, Appellee contends that we cannot review Appellant's arguments regarding the scope of Dr. Howe's report, motion for judgment notwithstanding the verdict, or manifest weight. Appellee also argues that as several theories of causation were presented at trial and each theory was supported by competent, credible evidence, the verdict is not against the manifest weight of the evidence. It is also Appellee's position that the evidence regarding Appellant's status as a non-compliant patient went directly to the issue of causation, so it was properly

admitted. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

<u>Factual and Procedural History</u>

**{¶3}** On June 16, 2007, Appellant was joking around with his children in a Walmart parking lot and stumbled on a curb, twisting his ankle. When he returned to his home, he noticed that his foot/ankle area was swollen. The next morning, his son noticed that the bottom of Appellant's foot had turned black. Appellant, a diabetic, was concerned but decided that he would wait to see if his foot improved before seeking medical treatment. Later that day, Appellant's condition had not improved and he called his doctor, Dr. Morcos. Dr. Morcos instructed Appellant to go to the emergency room.

**{¶4}** The emergency room doctor, Dr. Regule, ordered x-rays. Appellee interpreted these x-rays as normal. Based on Appellee's interpretation, Dr. Regule advised Appellant that he had suffered a sprained ankle and instructed him to stay off of his foot and to follow up with his physician within a week. Dr. Regule gave Appellant a splint and crutches and told him to use both crutches for one week, one crutch the following week, and then he could walk without the aid of crutches.

**{¶5}** Appellant did not follow up with his physician within a week. Instead, four to six weeks later, Appellant's foot still had not healed and he made an appointment with Dr. Morcos. Dr. Morcos referred Appellant to Dr. Ziran, who allegedly diagnosed Appellant with a collapsed foot. Dr. Ziran referred Appellant to Dr. DiDomenico, who took a new set of x-rays. After interpreting these x-rays, Dr.

DiDomenico suggested that Appellant undergo surgery to repair the collapse. Allegedly, after a series of second opinions, Appellant elected to have surgery on his foot. The first surgery took place in October of 2007; however, this was not his last, as Dr. DiDomenico performed a number of surgeries on the foot. Appellant suffered a series of infections as a result of the surgeries from approximately 2007 until 2011-2012. During that time span, Appellant spent time in multiple hospitals.

{¶6} A CT scan performed on Appellant's foot in September of 2007 revealed evidence that Appellant was subject to the Charcot process. The Charcot process occurs when a diabetic or neuropathic person suffers an injury but does not feel the pain normally associated with such an injury. As a result, the person continues to aggravate the injury through use of and weight bearing on the injured body part. As the person continues to bear weight on the injured body part, the bone begins to fragment at the joint and causes what is known as a Charcot fracture.

{¶7} On March 15, 2011, Appellant filed a medical malpractice and professional tort complaint against Appellee, Ohio Imaging, Dr. Regule, Mahoning Valley Emergency Specialists of Boardman, Ohio Department of Job and Family Services, and several John Doe physicians. After a series of dismissals, only Appellee remained as a party defendant. Appellant alleged in the complaint that Appellee misinterpreted his x-ray and missed a cuboid fracture in his foot. Appellant contended that this misdiagnosis resulted in an improper treatment plan which caused his foot to collapse.

**{¶8}** Appellee filed a motion for summary judgment, which was granted by the magistrate. However, Appellant filed an objection to the magistrate's decision and the trial court reversed the decision of the magistrate. The matter then proceeded to trial. At trial, Appellant presented his own testimony, as well as the testimony of Dr. Regule, Dr. DiDomenico, and an expert witness: Dr. Andrew Beirhals. In response, Appellee presented the testimony of his own expert witnesses, Dr. Conti and Dr. Farber. Dr. Howe also testified before the trial court, but it is unclear who called him as a witness. As a complete transcript has not been provided on appeal, this may or may not be an exhaustive witness list.

**{¶9}** At trial, three theories of causation were presented by the parties: (1) Appellant claimed that Appellee's negligent misinterpretation of his x-rays caused the collapse of his foot; (2) Appellee contended that Appellant suffered a Charcot fracture from bearing weight on the injured foot which caused the foot to collapse; and, (3) Appellee also asserted that the numerous surgeries performed by Dr. DiDomenico caused the foot to collapse.

**{¶10}** The jury did find that Appellee negligently misinterpreted Appellant's initial x-ray. However, the jury also found that Appellee's negligent act did not cause the collapse of Appellant's foot. Appellant filed a motion for judgment notwithstanding the verdict and a motion for a new trial. The trial court denied both motions. Appellant has filed a timely appeal.

<u>Appellate Record</u>

**{¶11}** An appellant bears the burden of showing error through the record; consequently, the appellant bears the duty of providing a transcript for appellate review. *Knapp v. Edwards Laboratories,* 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1980), citing *State v. Skaggs,* 53 Ohio St.2d 162, 372 N.E.2d 1355 (1978). Accordingly, "[w]hen portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." *Knapp* at 199.

**{¶12}** Appellant has failed to provide a complete transcript of the trial court proceedings. Certain of the missing portions are vital for a complete understanding as to what actually transpired at trial. Based on the appellate rules, where necessary transcripts are missing, we must presume the regularity of the record. Therefore, there are certain areas of this record where we must presume the validity of the lower court's proceedings in accordance with well-established Ohio law.

Assignment of Error No. 1

It was error by the trial court to deny the Plaintiff's Motion for Judgment Notwithstanding the Verdict.

**{¶13}** A trial court's ruling on a motion for judgment notwithstanding the verdict is reviewed *de novo* based on the legal sufficiency of the evidence rather than the weight or credibility given to the evidence. *Carrera v. Becdir Construction Co.,* 7th Dist. No. 98 CA 223, 2000 WL 459684, 4 (April 20, 2000), citing *Osler v. Lorain*, 28 Ohio St.3d 345, 347, 504 N.E.2d 19 (1986); *Boewe v. Ford Motor Co.*, 94 Ohio

App.3d 270, 280, 640 N.E.2d 850 (8th Dist.1992); *Byrley v. Nationwide Life Ins. Co.*, 118 Ohio App.3d 39, 691 N.E.2d 1087 (7th Dist.1997). The evidence is strongly construed in the non-moving party's favor. *Id.* When competent, credible evidence supports the non-moving party's claim that reasonable minds could reach different conclusions, the motion must be denied. *Id.,* citing *Osler*, *supra*; *Ramage v. Cent. Ohio Emergency Serv. Inc.*, 64 Ohio St.3d 97, 109 592 N.E.2d 828 (1992).

**{¶14}** Appellant contends that Appellee misinterpreted his x-ray and caused the emergency room doctor, Dr. Regule, to misdiagnose his injury. Appellant explains that although he was diagnosed with an ankle sprain, his foot actually contained a fracture. Appellant further explains that if the fracture had been properly diagnosed, he would have been provided a cast and instructed to keep weight off of that foot. Instead, he was advised that he could bear weight on the foot after two weeks and he was not provided with a cast. As a result of the misdiagnosis and improper treatment plan, Appellant claims that his foot and ankle collapsed. Appellant argues that the jury's finding that Appellee negligently misinterpreted the x-ray conflicts with the jury's verdict in favor of Appellee. Thus, in light of the evidence and the jury's finding, Appellant contends that the verdict is contrary to law.

**{¶15}** In response, Appellee argues Appellant cannot show that reasonable minds could only conclude that Appellee caused Appellant's injuries without producing a complete record on appeal. Even so, Appellee asserts that we need only find the presence of any probative evidence of record in support of the jury's decision in order to affirm. Appellee states that a CT scan taken several months after

Appellant's initial injury shows that the side of Appellant's foot opposite the alleged fracture contained evidence that Appellant suffered from the Charcot process. Based on this evidence, Appellee explains that the jury could have found Appellee negligent in reading the x-ray, but also find that it was this Charcot process that actually caused the collapse of Appellant's foot.

{¶16} Alternatively, Appellee advances the possibility that Dr. DiDomenico may have caused the foot to collapse by failing to follow the recommended treatment for Charcot. Appellee asserts that testimony from expert witness Dr. Conti supports an argument that the Charcot process began before the initial x-ray was interpreted and was complicated as a result of the numerous surgeries performed by Dr. DiDomenico. Thus, Appellee contends that competent, credible evidence in the record supports alternate causes for Appellant's ultimate injury other than his negligence.

{¶17} Further, Appellee argues that there is no evidence that his misinterpretation of Appellant's x-ray caused him to walk on his injured foot. Appellee notes that this is especially relevant as Appellant failed to provide the testimony of Dr. Regule, the physician who allegedly told Appellant he could walk on the injured foot after two weeks.

{¶18} In order to successfully assert a medical malpractice or professional malpractice claim, a plaintiff must satisfy three elements. *Scatamacchio v. W. Res. Care Sys.,* 161 Ohio App.3d 230, 2005-Ohio-2690, 829 N.E.2d 1247, ¶14. First, a plaintiff must establish the applicable standard of care recognized by the medical

community. *Id.* Second, the plaintiff must show that the physician or hospital negligently failed to meet the standard of care or failed to provide treatment conforming to the standard of care. *Id.* Third, and finally, the plaintiff must show a direct causal connection (causation) between the negligent act and the injury. *Id.* Causation is the sole element at dispute in this appeal. Three causation theories were presented at trial and each will be addressed separately.

*First Theory: Appellee's Misinterpretation of the X-Ray*

**{¶19}** Appellant presented the theory that Appellee negligently, directly, and proximately caused the collapse of his foot as a direct result of his negligent misinterpretation of Appellant's initial x-ray. As Appellant failed to provide the full transcripts of the lower court's proceedings, we lack a complete list of witnesses and their testimony. However, from the transcripts available for review, Appellant apparently testified and presented testimony from Dr. DiDomenico to support this theory.

**{¶20}** Appellant testified that he was joking with his children in a Walmart parking lot when he stepped off of a curb and twisted his ankle. The next morning, his foot turned black. After a few days, he went to the hospital and his foot and ankle were x-rayed. Appellee interpreted the x-rays as normal and as a result, Dr. Regule diagnosed Appellant with an ankle sprain. According to Appellant's testimony, Dr. Regule gave him a splint and crutches and advised him to follow up with his doctor within five to seven days. He also advised Appellant to use both crutches for one week, one crutch the following week, and then no crutches would be needed after

two weeks. Again, no direct testimony from Dr. Regule was introduced, but written orders were placed in the record.

**{¶21}** Appellant admittedly did not follow up with his doctor the following week. It was not until four weeks later that he saw Dr. Morcos. At that time, Dr. Morcos referred him to Dr. Ziran, who informed Appellant that his foot had collapsed. He was then referred to Dr. DiDomenico, who suggested surgery to repair the collapse. Appellant decided to have surgery based on Dr. DiDomenico's opinion, which Appellant testified was confirmed in several second opinions. However, we note that none of the doctors who allegedly provided a second opinion testified at trial. Dr. Morcos also apparently did not testify.

**{¶22}** Dr. DiDomenico testified that a cuboid fracture was presented in both the June 17, 2007 x-ray taken in the emergency room, and the August 20, 2007 x-rays that he personally took. According to Dr. DiDomenico, the cuboid fracture, which was missed by Appellee, caused Appellant's foot to collapse and, consequently, caused the collapse of his ankle. Dr. DiDomenico opined that Appellee's misinterpretation of the x-rays led to incorrect treatment, and that Appellant's foot would not have collapsed if the correct treatment plan had been followed.

*Second Theory: Charcot Process*

**{¶23}** Appellee presented two alternative theories of causation. The first of these is based on an allegation that the Charcot process caused Appellant's foot to collapse. Again, due to the limited transcripts, the only testimony available to us as

regards this theory was given by Dr. Conti. During his testimony, Dr. Conti explained that Appellant had two previously diagnosed conditions that led him to sustain a Charcot fracture.

**{¶24}** The first condition is diabetes. Dr. Conti explained that when Appellant suffered the initial injury, the misstep in the parking lot, he twisted his ankle. A non-diabetic person who suffered the same injury would simply have sustained a sprained ankle that would have healed. However, Dr. Conti explained that a diabetic, such as Appellant, might not feel the pain and continue to walk on the foot, which would then cause stress fragments to the bone. He explained that Appellant's second condition, neuropathy, added to the likelihood of this scenario.

**{¶25}** Dr. Conti described that neuropathy occurs when a person has nerve damage which causes numbness. The numbness masks the pain associated with an injury and a person with neuropathy will adversely continue to bear weight on the injured body part. Dr. Conti testified that a person with diabetes and neuropathy can cause a Charcot fracture as they continue to bear weight on an injured body part without feeling the pain that would prompt a healthy person to stop. The more neuropathy the person suffers from and the more uncontrolled the diabetes is, the quicker the process will proceed in this case, eventually causing the arch of the foot to flatten and collapse.

**{¶26}** According to Dr. Conti, the Charcot process began when Appellant suffered his initial injury in the Walmart parking lot. Because Appellant's neuropathy prevented him from feeling the pain, he continued to walk on the foot and the bone

began to fragment due to the Charcot process. As the Charcot process progressed, it would have eventually caused the ankle area to suffer this process, as well. Contrary to Appellant's expert, Dr. Conti testified that the June 17, 2007 x-rays did not show a cuboid fracture or a fracture line, which would indicate a healed fracture. However, Dr. Conti testified that by the time the September 4, 2007 CT scan was taken, this scan revealed "classic Charcot." Thus, Dr. Conti concluded that the Charcot process caused Appellant's foot to fracture and collapse, not an initial cuboid fracture.

**{¶27}** Dr. Conti supported his conclusion by explaining that if Appellant did, in fact, suffer from a cuboid fracture, the Charcot would have been prominent in that area, as it is triggered by trauma. However, Dr. Conti explained that while some evidence of Charcot was found in the CT scan around the cuboid, most of the Charcot was found on the side of Appellant's foot opposite the cuboid region. Dr. Conti explained that this pattern is consistent with the normal course of Charcot.

**{¶28}** There are two types of bone injuries discussed in this case: an acute fracture (a break in the bone) and a Charcot fracture (which produces fragmentation of the bone). According to Dr. Conti, these injuries are absolutely not the same. Contrary to Appellant's arguments on appeal, Dr. Conti did not agree with Dr. Ziran's diagnosis that Appellant sustained an acute fracture. Rather, he repeatedly testified that the films showed fragmentation consistent with the Charcot process. Dr. Conti specifically testified that although Dr. Ziran's report appears to have correctly

concluded that there was a break in the bone, which would be labeled as a fracture, he did not agree with Dr. Ziran's conclusion as to the type.

*Third Theory: Dr. DiDomenico's Surgeries*

**{¶29}** For his second alternative theory, Appellant presented testimony from Dr. DiDomenico and Dr. Conti to suggest that the numerous surgeries performed by Dr. DiDomenico could have caused Appellant's foot to collapse. Dr. Conti stressed that it would have been improper to cast Appellant's foot on his initial hospital visit due to the amount of swelling. Dr. Conti testified that the recommended treatment for Appellant's Charcot fracture, had it been appropriately diagnosed, would have been to instruct him to use crutches and then immobilize his foot with a total-contact cast once the swelling diminished. Instead of following the recommended treatment for Charcot, Dr. DiDomenico performed a series of surgeries on Appellant's foot.

**{¶30}** Dr. Conti explained that there are only three reasons to operate on a Charcot-affected foot. The first reason is a patient's pain level. Dr. Conti noted that Appellant never indicated that he was in significant pain and he had managed to walk on this foot before going to the emergency room, and then for several weeks before visiting Dr. Morcos, Dr. Ziran and Dr. DiDomenico. Thus, the evidence shows that surgery was not necessitated by pain. Second, surgery is suitable when the front of the foot is no longer connected to the back of the foot, which Dr. Conti states clearly did not happen in this case. Finally, surgery is also appropriate when the foot is so deformed that there is an increased risks of ulceration. Dr. Conti explained that this situation was also not present in Appellant as there was no real difference in the

shape of Appellant's injured foot as compared to his healthy foot and no bony prominence existed that would have predisposed the area to ulcers. Thus, Dr. Conti concluded that surgery was not appropriate in Appellant's case.

{¶31} In addition to being unnecessary, Dr. Conti testified that there were prominent risks associated with Appellant's surgery. First, Dr. Conti explained that Appellant was an uncontrolled diabetic. He explained that due to the high risk associated with performing surgery on diabetic patients, most doctors will not perform surgery on an uncontrolled diabetic. Second, Dr. Conti explained that performing surgery on a foot affected by Charcot that has not first been placed in a cast also presents a risk, as the bone has not had a chance to harden and reach the second stage of healing. Dr. Conti stressed that despite these complications, Dr. DiDomenico performed not just one surgery on Appellant's foot, but performed a significant number of surgeries, described as being in the "high teens."

{¶32} Under the correct treatment plan, Dr. Conti stated that Appellant's injuries would not have worsened. Although Appellant would have experienced a slight loss of his arch, Dr. Conti believed that his foot would have been pain free and he would have been able to wear a shoe. Dr. Conti noted that in Appellant's current condition, he is unable to place a shoe on his foot and is unable to bend his foot and ankle. Consequently, Dr. Conti concluded that the surgeries performed by Dr. DiDomenico caused the eventual complete collapse of Appellant's foot and ankle.

{¶33} During cross-examination, Dr. DiDomenico defended his treatment decision by asserting that he had the opportunity to observe Appellant and his injury

in person, whereas Dr. Conti could only rely on x-rays and records. Although he admitted that Appellant's foot only had "slight modification" when he saw him in August, Dr. DiDomenico claimed that surgery was necessary due to the collapse of Appellant's foot. (Tr., p. 46.) He added that ankle surgery also became necessary as a result of Appellant's foot problems.

{¶34} In addition to Dr. Conti and Dr. DiDomenico's testimony, Appellant testified that he suffered numerous infections after the surgeries. According to Appellant, he suffered various surgery-related infections from 2007 until either 2011 or 2012. Appellant testified that these infections led him to be hospitalized numerous times at different hospitals.

{¶35} Even with only a partial appellate record, it is apparent that reasonable minds could have concluded that while Appellee misinterpreted Appellant's x-ray, the actual collapse of Appellant's foot and ankle were caused by either the Charcot process or the repeated surgeries performed by Dr. DiDomenico. Both alternative theories were introduced and supported by some competent evidence that, if believed, would lead a reasonable person to find in favor of Appellee on the issue of causation. As competent credible evidence supports Appellee's argument that reasonable minds could reach different conclusions, we find that the trial court did not err in denying Appellant's motion for judgment notwithstanding the verdict. Accordingly, Appellant's first assignment of error is without merit and is overruled.

Second, Third, and Fourth Assignments of Error

It was error by the trial court to deny the Plaintiff's Motion for a New Trial.

It was error by the trial court to deny Plaintiff's Motion in Limine Concerning Medical Records and Commentary Regarding the Plaintiff s Medical History.

It was error by the trial court when it allowed standard of care trial testimony of Dr. Howe when it was outside the scope of his report and therefore prohibited by Local Rule 3 (A)(3).

{¶36} A trial court's ruling on a motion for a new trial is reviewed for an abuse of discretion. *Scatamacchio v. W. Res. Care Sys.,* 161 Ohio App.3d 230, 2005-Ohio-2690, 829 N.E.2d 1247, ¶52, citing *Antal v. Olde Worlde Products, Inc.*, 9 Ohio St.3d 144, 145, 459 N.E.2d 223 (1984); *Jenkins v. Krieger*, 67 Ohio St.2d 314, 423 N.E.2d 856 (1981). An abuse of discretion connotes more than an error of judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶37} Appellant urges that he is entitled to a new trial based on three separate alleged errors. The alleged errors are analyzed separately; however, the above stated standard of review applies to each argument.

*Motion in Limine*

{¶38} Appellant argues that the trial court erred when it denied his motion in limine regarding his medical records and medical history. As a result of the trial court's ruling, Appellant claims that the jury heard irrelevant and prejudicial

information regarding his status as a non-compliant diabetic patient. Appellant explains that the trial court admitted the evidence due to Appellee's theory that he was contributorily negligent but Appellee withdrew his request for a contributory negligence instruction at the close of trial. Based on this series of events, Appellant concludes that the real purpose for admitting his medical records was not to show that he was contributorily negligent. Rather, Appellant believes that it was to cast him as an irresponsible and non-compliant patient.

{¶39} In response, Appellee argues that Appellant has not shown which medical records were used and how they were used, nor has he provided the trial court's explanation for its ruling. Even so, Appellee asserts that Appellant failed to show prejudice as a result of the trial court's ruling.

{¶40} As to prejudice, Appellant generally contends that the evidence was admitted purely to cast him in a bad light in front of the jury. However, he has not cited to any basis on the record in support of his belief that the medical records evidence had this effect on the jury or that the evidence affected the jury's verdict.

{¶41} Appellant has failed to identify any specific instance of physical evidence or witness testimony involving his medical records or history. Further complicating our review, we lack a full transcript, thus cannot determine whether or in what manner Appellant's medical records or history may have been raised or discussed at trial.

{¶42} The first mention of Appellant's medical history in the partial transcript presented is found within Dr. DiDomenico's testimony. During this testimony,

Appellee questioned the doctor about Appellant's compliance with his diabetic treatment and whether surgery is appropriate for uncontrolled diabetics. As one of Appellee's theories centered on the argument that Dr. DiDomenico should not have performed surgery on an uncontrolled diabetic, the record demonstrates that this evidence was used to advance an argument regarding the cause of Appellant's injury.

**{¶43}** The other reference to Appellant's medical compliance is found within Dr. Conti's testimony. Dr. Conti testified that Appellant is an uncontrolled diabetic and most doctors will not perform surgery on an uncontrolled diabetic due to the high risks involved. Dr. Conti concluded that Appellant's foot collapsed due to Dr. DiDomenico's decision to perform surgery and the fact that Appellant is an uncontrolled diabetic was a factor in reaching this conclusion.

**{¶44}** As the record before us reflects that the testimony regarding medical history and compliance directly relates to the element of causation, the trial court did not err by denying Appellant's motion in limine. Accordingly, Appellant's argument is without merit and is overruled.

*Expert Witness Testimony*

**{¶45}** Next, Appellant argues that the trial court improperly permitted Dr. Howe to testify as to the standard of care, which was outside the scope of his report. Appellant cites to Local Rule 3(A)(3) which provides that an expert witness cannot testify regarding any material issue not addressed in the witness' report. Appellant states that Dr. Howe's limited report did not discuss whether Appellee's interpretation

of the initial x-ray met the requisite standard of care. Appellant urges that it was also improper to allow Dr. Howe to testify as to whether a CT scan was needed.

**{¶46}** Appellee notes that Dr. Howe's testimony is not part of this appellate record. As such, Appellee argues that Appellant has failed to meet his burden of demonstrating errors in the record. Even so, Appellee states that Dr. Howe's report clearly addressed whether Appellee's radiology report met the standard of care. Appellee explains that a radiology report consists of an interpretation of an x-ray, thus discussion of a radiology report must also contain discussion of the correct manner of interpretation of an x-ray. Appellee notes that Appellant admittedly was neither surprised by nor ambushed by Dr. Howe's report. Regardless, the jury found that Appellee negligently interpreted this x-ray, thus Appellant was successful on the issue of standard of care. Even if the trial court did err by allowing Dr. Howe's testimony, it is apparent that Appellant was unharmed by the error.

**{¶47}** Appellant has failed to provide a transcript of Dr. Howe's testimony, thus we cannot determine whether his testimony fell within the scope of his report. However, we have reviewed Dr. Howe's report and must note that it states: "I then reviewed the reports corresponding to the radiographs *and find the reports to be within the standard of care.*" (Emphasis added.) (Appellant's Brf., Exh. 1.) Since the report specifically states that Dr. Howe found the reports to be within the standard of care, any testimony as to the standard of care would fall within the scope of his report. Appellant's argument on this issue is without merit and is overruled.

*Manifest Weight of the Evidence*

**{¶48}** Finally, Appellant argues that he is entitled to a new trial, as the jury's verdict is against the manifest weight of the evidence. Appellant does not elaborate on this argument and appears to rely on the arguments he advances under his first assignment of error.

**{¶49}** "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Schambach v. Afford-A-Pool & Spa,* 7th Dist. No. 08 BE 15, 2009-Ohio-6809, ¶7, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978).

**{¶50}** Appellant claims that the trial court erred in denying his motion for a new trial based on the manifest weight of the evidence. As this argument presents a factual question, "we construe the evidence in a light most favorable to the trial court's action rather than to the original jury's verdict." *Dixon v. O'Brien,* 7th Dist. No. 12 MA 19, 2013-Ohio-1429, ¶28, citing *Williams v. Williams,* 7th Dist. No. 08 MA 248, 2009-Ohio-6162; *Jenkins v. Krieger,* 67 Ohio St.2d 314, 423 N.E.2d 856 (1981); *Rohde v. Farmer,* 23 Ohio St.2d 82, 262 N.E.2d 685 (1970).

**{¶51}** As previously stated, a plaintiff must prove three elements in order to successfully raise a medical malpractice or professional malpractice claim. *Scatamacchio*, supra, at ¶14. Again, the sole element disputed in this appeal is causation.

**{¶52}** As discussed within Appellant's first assignment of error, evidence was presented at trial which covered three theories of causation. As several treating

physicians and expert witnesses presented competent credible testimony as to three different, plausible theories of causation, the jury could have reasonably found that any one of the three was behind the collapse of Appellant's foot. It is clear from the jury's verdict that it did not find the theory that Appellee's negligent misinterpretation of the initial x-ray then caused Appellant's injury to be persuasive. As the record contains some competent, credible evidence supporting Appellee's alternate theories of causation, the jury's verdict did not result in manifest injustice. We cannot find that the trial court erred in denying Appellant's motion for a new trial. Accordingly, Appellant's argument is without merit and is overruled.

<u>Conclusion</u>

**{¶53}** This case came down to only one issue: causation. While we have before us only a limited appellate record, this record demonstrates that some competent, credible evidence was presented as to three separate theories of causation in this matter. The trial court did not err in denying Appellant's motion for judgment notwithstanding the verdict and motion for a new trial because the jury's verdict is supported in the record. Further, as one of the causation theories rests in Dr. DiDomenico's decision to perform multiple surgeries on an uncontrolled diabetic, the trial court did not err in denying Appellant's motion in limine regarding his medical records and history. Finally, although Appellant failed to produce Dr. Howe's testimony, the doctor does appear to address the standard of care within his report. Thus, any testimony regarding the standard of care would fall within the scope of his

report. Accordingly, all of Appellant's assignments of error are overruled and the judgment of the trial court is affirmed.

Donofrio, P.J., concurs.

Robb, J., concurs.